IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 22-1123
_____

JUUL LABS, INC.,

*Petitioner*,

v.

UNITED STATES FOOD AND DRUG ADMINISTRATION,

*Respondent*.

_____

On Petition for Review of a Final Marketing Denial Order
by the United States Food and Drug Administration

_____

**BRIEF FOR *AMICUS CURIAE* VAPOR TECHNOLOGY ASSOCIATION
IN SUPPORT OF PETITIONER'S EMERGENCY MOTION FOR STAY
PENDING REVIEW**

_____

Eric N. Heyer
Joseph A. Smith
Jessica Tierney
THOMPSON HINE LLP
1919 M Street, N.W., Suite 700
Washington, D.C.  20036
Phone: 202.331.8800
Fax:  202.331.8330
Eric.Heyer@ThompsonHine.com
Joe.Smith@ThompsonHine.com
Jessica.Tierney@ThompsonHine.com

*Counsel for Amicus Curiae Vapor
Technology Association*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the undersigned counsel of record certifies that *amicus curiae* Vapor Technology Association is a 501(c)(6) non-profit membership organization representing manufacturers, wholesalers, distributors, retailers, and entrepreneurs who have developed quality vapor products that has no parent corporation and that no publicly held corporation owns 10 percent or more of the stock of Petitioner.


<u>     /s/ Eric N. Heyer               </u>

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES
## PURSUANT TO CIRCUIT RULE 28

### A.     Parties and *Amici*

All Parties appear in Petitioner's Emergency Motion for Stay Pending Review. Proposed *amici* 38 National and State Electronic Nicotine Delivery System Product Advocacy Associations, the National Association of Convenience Stores, and a group of individual public health academics and professionals have filed motions for leave to file an *amicus curiae* brief in support to Petitioners. *Amicus* Vapor Technology Association is not aware of any other parties or *amici*.

### B.     Ruling Under Review

Petitioner's Emergency Motion for Stay Pending Review accurately references the ruling under review.

### C.     Related Cases

An accurate statement regarding related cases appears in Petitioner's Emergency Motion for Stay Pending Review. While *amicus* Vapor Technology Association's brief references herein multiple other cases involving appeals of FDA marketing denial orders for electronic nicotine delivery system products, *amicus* is not aware of additional related cases involving exactly the same issues as presented in this petition.


_____ /s/ Eric N. Heyer _____

ii

## TABLE OF CONTENTS

**Page**

INTEREST OF THE AMICUS CURIAE ..................................................1

INTRODUCTION ................................................................................1

ARGUMENT .......................................................................................2

I.      Background on FDA's PMTA Review Process .............................2

        A.    The PMTA Process and FDA's Instructions to Manufacturers ...........2

        B.    FDA's Internal and Undisclosed Change to the Standard for Review of PMTAs for Flavored ENDS Products ...................................................3

        C.    FDA's Issuance of Marketing Denial Orders and Subsequent Litigation..........................................................5

        D.    FDA's Final PMTA Rule......................................................6

II.     FDA's Denial of JLI's PMTA Mimics FDA's Failure to Conduct ....Holistic Reviews of Other PMTAs ........................................................7

III.    A Stay is Warranted Given FDA's Prior Actions and Treatment of JLI .....11

CONCLUSION ..................................................................................11

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bidi Vapor v. FDA*,
No. 21-13340, 2022 U.S. App. LEXIS 2951 (11th Cir. Feb. 1,
2022) ...................................................................................................8

*Gripum, LLC v. FDA*,
No. 21-2840, 2021 U.S. App. LEXIS 40247 (7th Cir. Nov. 4,
2021) ...................................................................................................8

*My Vape Order, Inc. v. FDA*,
No. 21-71302 (9th Cir. Dec. 30, 2021) ...............................................9

*Northwest Res. Info. Ctr., Inc. v. Northwest Power and Conservation
Council*, 730 F.3d 1008 (9th Cir. 2013) ...........................................10

*Shinseki v. Sanders*,
556 U.S. 396 (2009) ...........................................................................10

*Turning Point Brands, Inc. v. FDA*,
No. 21-855 (6th Cir. Oct. 8, 2021) ......................................................9

*Wages & White Lion Invs., LLC v. FDA*,
16 F.4th 1130 (5th Cir. 2021) ..............................................................8

**Statutes**

21 U.S.C. § 387j..........................................................................................2

## Rules and Regulations

FDA, *Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Regulations on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*, 81 Fed. Reg. 28973 (May 10, 2016) ..................................................................................................2

FDA, *Premarket Tobacco Product Applications and Recordkeeping Requirements, Proposed Rule*, 84 Fed. Reg. 50566 (Sept. 25, 2019) ....................................2, 3

FDA, *Premarket Tobacco Product Applications and Recordkeeping Requirements, Final Rule*, 86 Fed. Reg. 55300 (Oct. 4, 2021) ................................................6, 7

## Other Authorities

FDA, Press Release, *FDA Makes Significant Progress in Science-Based Public Health Application for Review, Taking Action on Over 90% of More than 6.5 Million 'Deemed' New Tobacco Products Submitted* (Sept. 9, 2021), https://bit.ly/33Av9oz ................................................5

FDA, *Deemed Product Review: A Conversation with the Office of Science* (June 11, 2021), https://bit.ly/3OCqgxt....................................................3

FDA, Press Release, *FDA Denies Marketing Applications for About 55,000 Flavored E-Cigarette Products for Failing to Provide Evidence They Appropriately Protect Public Health* (Aug. 26, 2021), https://bit.ly/32ehP8C;..............................................................5

FDA, Guidance for Industry, *Premarket Tobacco Applications for Electronic Nicotine Delivery Systems* (June 2019), https://bit.ly/3AcHYQj ........................................................................2

## INTEREST OF THE *AMICUS CURIAE*

*Amicus Curiae[1]* is the Vapor Technology Association ("VTA"), a national trade organization representing manufacturers, distributors, and retailers of quality nicotine vapor products. VTA has consistently advocated for rational regulation to ensure adult access to vapor products while preventing youth access and appeal. *Amicus* seeks to contextualize the marketing denial order ("MDO") issued to JUUL by providing the Court information about FDA's inconsistent and opaque Pre-Market Tobacco Application ("PMTA") review process and recent litigation in other circuits arising from other MDOs.

## INTRODUCTION

FDA has engaged in a pattern of denying many ENDS PMTAs based on selective, shifting, and new criteria in a manner inconsistent with the agency's regulations and guidance, but which satisfies the very public demands made of the agency by members of Congress and well-funded pressure groups. In so doing, the agency is depriving millions of adult smokers access to vaping products that FDA itself publicly acknowledges generally present far fewer physiological health risks than toxic and deadly cigarettes and which smokers are successfully using to permanently quit smoking. FDA has ignored evidence in those applications demonstrating the public health benefits of ENDS products to adult smokers that

---

[1] *Amicus* represents that no party's counsel authored this brief and neither the parties nor counsel contributed money intended to fund preparing or submitting this brief.

outweigh the risks to youth. FDA's practice of overlooking or ignoring contradictory evidence while focusing on the seeming lack of one particular piece of evidence to the exclusion of all else has pervaded the agency's review of ENDS PMTAs. By all appearances, FDA's MDO issued to Juul Labs, Inc. ("JLI") based on the alleged absence of data that was actually present is another instance of this practice.

## ARGUMENT

I.      **Background on FDA's PMTA Review Process**

   A.      **The PMTA Process and FDA's Instructions to Manufacturers**

All manufacturers of ENDS products must file PMTAs to remain on the market. *See* 81 Fed. Reg. at 28,990-97; 21 U.S.C. § 387j. In June 2019, FDA published final guidance on the recommended contents for PMTAs for ENDS products. FDA, Guidance for Industry, *Premarket Tobacco Applications for Electronic Nicotine Delivery Systems* (June 2019), https://bit.ly/3AcHYQj. FDA stated: "Given the relatively new entrance of ENDS on the U.S. market . . . limited data may exist from scientific studies and analysis . . . . Nonetheless, in general, FDA does not expect that applicants will need to conduct long-term studies to support an application." *Id.* at 12-13.

Following VTA's filing of a lawsuit challenging the lack of a regulation governing the contents of PMTAs, in September 2019, FDA issued such a proposed rule, reiterating that the agency did "not expect that long-term clinical studies (i.e.,

those lasting approximately 6 months or longer) [would] need to be conducted for each PMTA." 84 Fed. Reg. 50566, 50619.

**B.    FDA's Internal and Undisclosed Change to the Standard for Review of PMTAs for Flavored ENDS Products**

All PMTAs needed to be submitted to FDA on or before September 9, 2020. On June 11, 2021, FDA held a public meeting during which it disclosed its PMTA review process. FDA explained that PMTAs of the "manufacturers with the largest market share," including JLI, were prioritized in "a separate queue" so that decisions could be made by September 9, 2021, since these decisions would have the "greatest public health impact" given their ubiquitous presence in the market. FDA, *Deemed Product Review: A Conversation with the Office of Science* (June 11, 2021), https://bit.ly/3OCqgxt. FDA also disclosed that it had "randomized" the review of all other PMTAs and that those reviews would continue beyond September 9, 2021. *Id.*

Less than one month later,  FDA's Office of Science ("OS") issued an internal memorandum completely reversing its publicly stated process and priorities. OS was to prioritize the previously "randomized" review of small manufacturer PMTAs and implement a new "fatal flaw" analysis for those PMTAs, imposing a new prerequisite of long-term product-specific studies for flavored ENDS products which FDA had previously acknowledged was not required. Responsibility for this reversal of process and new "standard for evidence" was placed with the then-Acting

Commissioner: "Office of Science has been tasked with developing a new plan to effectively manage the remaining non-tobacco flavored ENDS PMTAs," and "[t]his task has been assigned by the acting commissioner" to enable FDA to take "final action on as many [flavored ENDS] applications as possible by September 10, 2021." AA1-2.

Rather than review an entire PMTA, FDA would "conduct a Fatal Flaw review . . . a simple review in which the reviewer examines the submission to identify whether or not it contains the necessary type of studies." AA2. The "fatal flaw" for flavored ENDS products would be the absence of randomized controlled trials ("RCTs") or longitudinal cohort studies showing that the applicant's product is more effective at promoting smoking cessation relative to tobacco-flavored ENDS products—the very types of long-term cessation studies the agency had previously stated were unnecessary. *See* AA1.[2] Any application lacking this evidence would "likely receive a [MDO]." AA2.[3]

---

[2] *See also* AA46 (May 8, 2020 FDA letter to ENDS manufacturer stating that "[c]urrently, FDA does not have specific requirements for evaluating comparator products in a PMTA").

[3] FDA's counsel described FDA's "fatal flaw" review process as one where the lack of comparative efficacy evidence provided a "dispositive basis" to deny the applications and "end[] the analysis" without further review. *See* Oral Argument Recording, *Prohibition Juice Co. v. FDA*, Case No. 21-1201, at 46:40 – 48:21 (D.C. Cir. Apr. 21, 2022), https://tinyurl.com/2fmm9het.

This change came just two weeks after then-Acting Commissioner Janet Woodcock testified before Congress and encountered substantial political pressure to ignore FDA's prior representations to applicants and obligation to conduct individualized reviews of PMTAs, to deny all PMTAs for flavored ENDS products, and to deny JLI's PMTAs. *See* PA.767-803.

### C.    FDA's Issuance of Marketing Denial Orders and Subsequent Litigation

Between August 26, 2021, and September 14, 2021, FDA issued a series of press releases announcing it had denied PMTAs for nearly one million flavored ENDS products and suggested for the first time that marketing of flavored ENDS products would be authorized only if PMTAs included particular studies showing that an applicant's flavored ENDS products were more effective at promoting smoking cessation than the applicant's comparable tobacco-flavored ENDS products. *See* FDA, Press Release, *FDA Denies Marketing Applications for About 55,000 Flavored E-Cigarette Products for Failing to Provide Evidence They Appropriately Protect Public Health* (Aug. 26, 2021), https://bit.ly/32ehP8C; FDA, Press Release, *FDA Makes Significant Progress in Science-Based Public Health Application for Review, Taking Action on Over 90% of More than 6.5 Million 'Deemed' New Tobacco Products Submitted* (Sept. 9, 2021), https://bit.ly/33Av9oz. The mass denials by FDA, identical in rationale, expressly stated that once FDA determined that long term studies were absent, FDA refused to review any of the

myriad components of the applications, including any of the science submitted. AA35.

On September 14, 2021, VTA wrote to FDA to express concerns regarding the dramatic change in process and substantive requirements, explaining that the imposition of a retroactive prerequisite for long-term studies one year after the application deadline passed raised serious questions. VTA noted the following:

> [T]he only thing that has changed recently . . . is the cacophony from Congress and special interest groups who have made it their mission to harangue the FDA publicly at hastily called hearings with an expressly stated intent to interfere with FDA's regulatory process . . . demanding that FDA ignore the science altogether by banning all flavors outright or by rejecting certain PMTAs regardless of the science submitted with that PMTA.

AA21.

There are approximately forty pending federal appeals challenging FDA's denials in various circuits, including this Circuit. This has led to FDA and the circuit courts rescinding or staying multiple MDOs because FDA both overlooked relevant evidence or intentionally refused to review entire PMTAs.

### D.    FDA's Final PMTA Rule

FDA published its final PMTA rule on October 4, 2021. 86 Fed. Reg. 55300 ("Final Rule"). The Final Rule declined "to create a series of criteria that either all products or a specific subset of products must meet in order for marketing of such products to be considered [appropriate for the protection of public health]." 86 Fed. Reg. at 55386. Instead, the Final Rule stated that appropriateness for protection of

6

the public health involves a "complex determination," *id.* at 55335, for which FDA "considers many factors," *id.* at 55314, and FDA does not make a "determination on one static set of requirements," *id.* at 55385. FDA stressed that the determination of appropriateness for the protection of public health "requires a balancing" of risks and benefits, *id.* at 55384. FDA stated that this determination would be "based on all of the contents of the application," *id*. at 55320, and "will be made with respect to . . . the population as a whole, rather than whether a product meets each item in a series of specific criteria" *id.* at 55386.

## II.    FDA's Denial of JLI's PMTA Mimics FDA's Failure to Conduct Holistic Reviews of Other PMTAs

This is not the first time that FDA claimed the absence of one subset of data as justification for denying PMTAs without a full review. In denying JLI's PMTAs, FDA relied on the absence of a specific subset of toxicological data to justify its denial but failed to conduct a holistic review. As noted above, FDA's "fatal flaw" standard was used to deny PMTAs covering millions of products and to absolve the agency from its responsibility to review and assess the entire application. Under no circumstances could FDA's approach in either scenario be considered the holistic review required by law and FDA's own regulations.

The Fifth, Seventh, and Eleventh Circuits have all stayed MDOs largely based on arguments that FDA failed to consider *all* the evidence submitted, instead focusing exclusively on the absence of one particular piece of evidence. *See Wages*

7

& *White Lion Invs., LLC v. FDA*, 16 F.4th 1130 (5th Cir. 2021); *Gripum, LLC v.*
*FDA*, No. 21-2840, 2021 U.S. App. LEXIS 40247 (7th Cir. Nov. 4, 2021); *Bidi*
*Vapor v. FDA*, No. 21-13340,2022 U.S. App. LEXIS 2951 (11th Cir. Feb. 1, 2022).
For example, in *Wages & White Lion*, the Fifth Circuit focused on FDA's failure to
consider the applicant's marketing plan "for the sake of efficiency" because the
applicant did not have RCTs even though FDA had called marketing plans a "critical
factor in [] FDA's statutorily required determination." 16 F.4th 1130, 1136-1139.
There, as with JLI's MDO, once FDA decided that the apparent lack of one particular
piece of evidence doomed the applicant's PMTA, it decided it could ignore other
evidence previously identified as "critical." *Id.* In staying the MDO, the Fifth Circuit
rejected FDA's "efficiency" justification for ignoring the marketing plan as
"insufficient." *Id*. at 1137.

FDA has also previously overlooked critical scientific information in issuing
MDOs for ENDS products. JLI states that it presented the allegedly absent
toxicological information in its PMTA. JLI Mtn. at 2-3, 16-18. Previously, in its
implementation of its "fatal flaw" review for flavored products, FDA issued MDOs
to several companies for failing to submit evidence that the applicants had *in fact*
included in their applications. In at least four cases, FDA rescinded or stayed MDOs
it had issued for the supposedly absent comparative efficacy studies. In one case,
FDA was forced to acknowledge that "[u]pon further review of the administrative

record, FDA found relevant information that was not adequately assessed." *See Turning Point Brands, Inc. v. FDA*, No. 21-855 (6th Cir. Oct. 8, 2021) (ECF No. 19 at 9).

In three cases, it was only *after* litigation began that FDA conducted a comprehensive review of the PMTAs and realized that the applicants did in fact present the information FDA had claimed was absent. In another case, FDA entered an administrative stay and agreed to hold the litigation in abeyance pending further review of the applicant's PMTA after the applicant stressed that the application contained many of the same studies and evidence as other applicants whose PMTAs had been rescinded. *See My Vape Order, Inc. v. FDA*, No. 21-71302 (9th Cir. Dec. 30, 2021) (ECF No. 45).

Like the applicants whose MDOs were rescinded, JLI's MDO appears to stem from FDA claiming that JLI did not include data on a specific point when, in reality, JLI submitted 6,000 pages of data on the issue. And, like the cases involving judicial stays, FDA appears to have decided that the alleged lack of data on one point allows it to ignore other relevant evidence of potential public health benefits in JLI's PMTA. As with the stayed cases, FDA cannot simply ignore 119,000 pages of data and analysis submitted by JLI demonstrating the public-health benefits of its ENDS products merely because the agency failed to properly review the other 6,000 pages of aerosol data. JLI Mtn. at 1-2.

FDA's abdication of its obligation to review all the science and base its determination on "all of the contents" of JLI's PMTA is not a "harmless error," particularly if the MDO resulted from the "collective[]" alleged issues in JLI's PMTA and not any single alleged deficiency. *See* JLI Mtn. at 18; *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009) (establishing prejudice from agency error is not a "particularly onerous requirement"); *Northwest Res. Info. Ctr., Inc. v. Northwest Power and Conservation Council*, 730 F.3d 1008, 1021 (9th Cir. 2013) (agency error is harmless only when it "clearly had no bearing on the procedure used or the substance of [the] decision reached").

Finally, this is not the first time that FDA has issued major MDOs so close in time to dramatic and direct public pressure from members of Congress. The facts articulated in JLI's motion closely mirror the facts immediately preceding the FDA's sudden re-prioritization of its PMTA review process and adoption of its new, secret "fatal flaw" review standard for flavored ENDS products, with the only intervening circumstances being public pressure. JLI's complaint in this regard is not new, as evidenced from VTA's letter to FDA. AA21. Had the Office of Science been allowed to conduct full reviews without interference, VTA believes FDA would have reached different conclusions on marketing orders.

### III.    A Stay is Warranted Given FDA's Prior Actions and Treatment of JLI

A stay is also warranted as the balance of harms and public interest support JLI. FDA cannot credibly argue that there is an immediate and imperative need to remove JLI's products from the market now, rather than after this Court reviews FDA's action. FDA took nearly two years to review JLI's PMTA, and during that time allowed JLI's products to remain on the market. The lack of urgency for reviewing JLI's PMTA and removing its products from the market as a result of an MDO is reinforced by FDA's decision in July 2021 to completely reprioritize small manufacturer applications, rather than fulfill the promises it made in June 2021 to prioritize decisions on JLI's and the other large manufacturer's applications first.

Furthermore, over the two years that FDA reviewed JLI's application, youth use of ENDS products dropped substantially—despite JLI's continued presence on the market. The 2020 National Youth Tobacco Survey ("NYTS") showed that current use among high school-aged youth dropped from 27.5% to 19.6%, with another drop to 11.3% reported in the 2021 NYTS. *See* AA13-15; AA16-18.

With FDA showing no urgency in reviewing JLI's application and articulating that there are no immediate concerns regarding the toxicity of JLI's products, the balance of harms and the public interest support JLI.

## <u>CONCLUSION</u>

The Court should grant Petitioner Juul Labs, Inc.'s motion for a stay.

Respectfully submitted,

THOMPSON HINE LLP

By:_____/s/ Eric N. Heyer_____
     Eric N. Heyer
     Joseph A. Smith
     Jessica Tierney
     1919 M Street, NW, Suite 700
     Washington, DC 20036
     Phone: 202.331.8800
     Fax: 202.331.8330
     Eric.Heyer@ThompsonHine.com
     Joe.Smith@ThompsonHine.com
     Jessica.Tierney@ThompsonHine.com

     *Counsel for Amicus Curiae Vapor
     Technology Association*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing *amicus* brief complies with the type-volume requirement set forth in Federal Rules of Appellate Procedure 32. The word count feature found in Microsoft Word reports that the *amicus* brief contains 2,597 words, excluding the items exempted under F.R. App. P. 32(f).

The *amicus* brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32 because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14 font.


<u>        /s/ Eric N. Heyer                </u>
Eric N. Heyer

## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify under Fed. R. App. P. 29(a)(2) that I contacted counsel for both the Petitioner and the Respondent on July 1, 2022, by electronic mail seeking consent to file the subject *Amicus Curiae* Brief by July 5, 2022, and that counsel for both Petitioner and Respondent articulated their consent.

　　　　　　　　　　　　　　/s/ Eric N. Heyer
　　　　　　　　　　　　　Eric N. Heyer
　　　　　　　　　　　　　THOMPSON HINE LLP
　　　　　　　　　　　　　1919 M Street, NW, Suite 700
　　　　　　　　　　　　　Washington, DC 20036
　　　　　　　　　　　　　Phone: 202.331.8800
　　　　　　　　　　　　　Fax: 202.331.8330
　　　　　　　　　　　　　eric.heyer@thompsonhine.com

　　　　　　　　　　　　　*Counsel for Amicus Curiae Vapor*
　　　　　　　　　　　　　*Technology Association*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 5, 2022, a true and correct copy of the foregoing

was electronically filed with the Clerk and served via the Court's ECF / ECM system

on the following:

John C. O'Quinn
Jason M. Wilcox
Devin S. Anderson
*Counsel for Petitioner Juul Labs, Inc.*

Alisa B. Klein
Lindsey Powell
*Counsel for Respondent U.S. Food and Drug Administration*

J. Gregory Troutman
*Counsel for Amicus National and State Electronic Nicotine Delivery System Product Advocacy Associations*

Steven P. Lehotsky
Scott A. Keller
Gabriela Gonazalez-Araiza
Kyle D. Hawkins
*Counsel for Amicus National Association of Convenience Stores*

      /s/ Eric N. Heyer
Eric N. Heyer
THOMPSON HINE LLP
1919 M Street, NW, Suite 700
Washington, DC 20036
Phone: 202.331.8800
Fax: 202.331.8330
eric.heyer@thompsonhine.com

*Counsel for Amicus Curiae Vapor Technology Association*

# AMICUS ADDENDUM

## Table of Contents

1. FDA, Memorandum, *ENDS Containing Non-Tobacco Flavored E-Liquid: Approach to PMTAs not in Substantive Scientific Review* (Phase III) (July 9, 2021) (*Wages & White Lion, Invs., LLC v. FDA*, No. 21-60766 (5th Cir. Jan. 14, 2022) (ECF No. 69) ............................................................................ AA1

2. Teresa W. Wang et al., *E-cigarette Use Among Middle and High School Students – United States, 2020*, 69 MMWR 1310-12, https://bit.ly/34gMgMn.............................................................................AA13

3. Eunice Park-Lee et al., Notes from the Field: *E-Cigarette Use Among Middle and High School Students – National Youth Tobacco Survey, United States, 2021*, 70 MMWR 1387-1389 (2021), https://bit.ly/3rvZaOp .................AA16

4. Vapor Technology Association, Letter to Mitch Zeller, Director of FDA Center for Tobacco Products (September 14, 2021) ...............................AA19

5. FDA, Sample Decision Summary Document, https://bit.ly/3Ato875.....AA22

6. FDA Letter to Bidi Vapor, LLC dated May 8, 2020, Corrected Appendix – Volume II, *Bidi Vapor LLC v. FDA*, Case No. 21-13340 (11th Cir.). ....AA42



# Memorandum

| To: | File |
|---|---|
| From: | Anne Radway, M.S.<br>Associate Director<br>Division of Regulatory Project Management<br>Office of Science | For _Rosanna Beltre -S_ Digitally signed by Rosanna Beltre -S Date: 2021.07.09 11:28:49 -04'00' |
| Through: | Matthew Holman, Ph.D.<br>Director<br>Office of Science | Digitally signed by Matthew R. Holman -S Date: 2021.07.09 11:33:09 -04'00' |
| Subject: | ENDS Containing Non-Tobacco Flavored E-Liquid: Approach to PMTAs[1] not in Substantive Scientific Review (Phase III) |

## Background

As of September 9, 2020, FDA commenced review of premarket applications for electronic nicotine delivery systems (ENDS) products on the market as of August 8, 2016; applicants were required by a court order to submit applications to FDA by this date. The majority of these applications are for non-tobacco flavored ENDS products.[2] To date, OS has implemented its plan to review a subset of these applications in this first year: the PMTAs selected for review were identified using a plan described in the Premarket Application Review Prioritization Plan memorandum[3], signed August 31, 2020. Office of Science has been tasked with developing a new plan to effectively manage the remaining non-tobacco flavored ENDS PMTAs not in Phase III, substantive scientific review. This task has been assigned by the Acting Commissioner given the likely impact on the marketplace on September 10, 2021 (the end of the enforcement discretion period for deemed tobacco products) and in order to take final action on as many applications as possible by September 10, 2021. The objective is to address these applications by applying a standard for evidence necessary to demonstrate an incremental benefit to adult smokers of non-tobacco flavored ENDS products.

## Discussion

As described in Section 910 of the FD&C Act, to receive marketing authorization under the PMTA pathway, FDA must conclude that the marketing of the product is appropriate for the protection of public health (APPH), including both tobacco users and nonusers. Based on the information available to date, FDA has determined this evaluation requires evidence that can demonstrate whether an applicant's new non-tobacco flavored product(s) will provide an incremental benefit to adult smokers relative to the applicant's tobacco-flavored product(s). In particular, the evidence necessary for this evaluation would be provided by either a randomized controlled trial (RCT) or a longitudinal cohort

---

[1] Premarket Tobacco Product Applications
[2] Refers to open e-liquids, closed e-liquids, and closed e-cigarettes containing non-tobacco flavored e-liquid
[3] See addendums dated September 24, 2020 and May 11, 2021

TRITON - FDA 2 - 005144

study.  The absence of these types of studies is considered a fatal flaw, meaning any application lacking this evidence will likely receive a marketing denial order (MDO).

Considering the large number of applications that remain to be reviewed by the September 9, 2021 deadline, OS will conduct a Fatal Flaw review of PMTAs not in Phase III for non-tobacco flavored ENDS products.  The Fatal Flaw review is a simple review in which the reviewer examines the submission to identify whether or not it contains the necessary type of studies.  The Fatal Flaw review will be limited to determining presence or absence of such studies; it will not evaluate the merits of the studies.  To decrease the number of PMTAs without final action by September 9, 2021, OS used a database query to identify the top twelve[4] manufacturers with the largest number of pending PMTAs not in Phase III[5] for non-tobacco flavored e-liquid products.  These applications were pulled out of their respective place in the PMTA priority list, and Phase II Filing was initiated (see Appendix A).  Following completion of filing those applications that are filed will immediately initiate Fatal Flaw review.

For the remaining PMTAs not in Phase III for non-tobacco flavored e-liquid products, FDA will send an General Correspondence letter requesting the applicant to confirm if their PMTA contains such evidence and, if so, to direct FDA to the location in the application where the studies can be found.  Manufacturers eligible for this process, OS is identifying open PMTAs submitted from April 1, 2020 to September 9, 2020 that have been Received, Accepted and/or Filed and have not entered Phase III.  Additionally, PMTAs were filtered based on product characterizing flavor (non-tobacco flavors), product type (i.e., open or closed e-liquid or closed e-cigarette), and category/subcategory (i.e., Other/Other).  General Correspondence letters will be issued to companies listed in Appendix B.  If later FDA discovers a manufacturer was not issued a General Correspondence letter when they should have been, the applications will be evaluated on a case-by-case basis.

---

[4] These applications represent 85% of all pending PMTA applications.
[5] These will be the same manufacturers/PMTAs as identified for prioritized Filing Reviews in the June 30, 2021, memorandum.

TRITON - FDA 2 - 005145

Appendix A



| # | Manufacturer Name |
|---|---|
| 1 | (b)(4) |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |

TRITON - FDA 2 - 005146

Appendix B

| # | Manufacturer Name |
|---|---|
| 1 | (b)(4) |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |
| 29 | |
| 30 | |
| 31 | |
| 32 | |
| 33 | |
| 34 | |
| 35 | |
| 36 | |
| 37 | |
| 38 | |
| 39 | |
| 40 | |

TRITON - FDA 2 - 005147

| # | Manufacturer Name |
|---|---|
| 41 | (b)(4) |
| 42 | |
| 43 | |
| 44 | |
| 45 | |
| 46 | |
| 47 | |
| 48 | |
| 49 | |
| 50 | |
| 51 | |
| 52 | |
| 53 | |
| 54 | |
| 55 | |
| 56 | |
| 57 | |
| 58 | |
| 59 | |
| 60 | |
| 61 | |
| 62 | |
| 63 | |
| 64 | |
| 65 | |
| 66 | |
| 67 | |
| 68 | |
| 69 | |
| 70 | |
| 71 | |
| 72 | |
| 73 | |
| 74 | |
| 75 | |
| 76 | |
| 77 | |
| 78 | |
| 79 | |
| 80 | |
| 81 | |
| 82 | |

TRITON - FDA 2 - 005148

| # | Manufacturer Name |
|---|---|
| 83 | (b)(4) |
| 84 | |
| 85 | |
| 86 | |
| 87 | |
| 88 | |
| 89 | |
| 90 | |
| 91 | |
| 92 | |
| 93 | |
| 94 | |
| 95 | |
| 96 | |
| 97 | |
| 98 | |
| 99 | |
| 100 | |
| 101 | |
| 102 | |
| 103 | |
| 104 | |
| 105 | |
| 106 | |
| 107 | |
| 108 | |
| 109 | |
| 110 | |
| 111 | |
| 112 | |
| 113 | |
| 114 | |
| 115 | |
| 116 | |
| 117 | |
| 118 | |
| 119 | |
| 120 | |
| 121 | |
| 122 | |
| 123 | |
| 124 | |

AA6
A160

TRITON - FDA 2 - 005149

| # | Manufacturer Name | |
|---|---|---|
| 125 | (b)(4) | |
| 126 | | |
| 127 | | |
| 128 | | |
| 129 | | |
| 130 | | |
| 131 | | |
| 132 | | |
| 133 | | |
| 134 | | |
| 135 | | |
| 136 | | |
| 137 | | |
| 138 | | |
| 139 | | |
| 140 | | |
| 141 | | |
| 142 | | |
| 143 | | |
| 144 | | |
| 145 | | |
| 146 | | |
| 147 | | |
| 148 | | |
| 149 | | |
| 150 | | |
| 151 | | |
| 152 | | |
| 153 | | |
| 154 | | |
| 155 | | |
| 156 | | |
| 157 | | |
| 158 | | |
| 159 | | |
| 160 | | |
| 161 | | |
| 162 | | |
| 163 | | |
| 164 | | |
| 165 | | |
| 166 | | |

TRITON - FDA 2 - 005150

| # | Manufacturer Name | |
|---|---|---|
| 167 | (b)(4) | |
| 168 | | |
| 169 | | |
| 170 | | |
| 171 | | |
| 172 | | |
| 173 | | |
| 174 | | |
| 175 | | |
| 176 | | |
| 177 | | |
| 178 | | |
| 179 | | |
| 180 | | |
| 181 | | |
| 182 | | |
| 183 | | |
| 184 | | |
| 185 | | |
| 186 | | |
| 187 | | |
| 188 | | |
| 189 | | |
| 190 | | |
| 191 | | |
| 192 | | |
| 193 | | |
| 194 | | |
| 195 | | |
| 196 | | |
| 197 | | |
| 198 | | |
| 199 | | |
| 200 | | |
| 201 | | |
| 202 | | |
| 203 | | |
| 204 | | |
| 205 | | |
| 206 | | |
| 207 | | |
| 208 | | |

| # | Manufacturer Name | |
|---|---|---|
| 209 | (b)(4) | |
| 210 | | |
| 211 | | |
| 212 | | |
| 213 | | |
| 214 | | |
| 215 | | |
| 216 | | |
| 217 | | |
| 218 | | |
| 219 | | |
| 220 | | |
| 221 | | |
| 222 | | |
| 223 | | |
| 224 | | |
| 225 | | |
| 226 | | |
| 227 | | |
| 228 | | |
| 229 | | |
| 230 | | |
| 231 | | |
| 232 | | |
| 233 | | |
| 234 | | |
| 235 | | |
| 236 | | |
| 237 | | |
| 238 | | |
| 239 | | |
| 240 | | |
| 241 | | |
| 242 | | |
| 243 | | |
| 244 | | |
| 245 | | |
| 246 | | |
| 247 | | |
| 248 | | |
| 249 | | |
| 250 | | |

TRITON - FDA 2 - 005152

| # | Manufacturer Name |
|---|---|
| 251 | (b)(4) |
| 252 | |
| 253 | |
| 254 | |
| 255 | |
| 256 | |
| 257 | |
| 258 | |
| 259 | |
| 260 | |
| 261 | |
| 262 | |
| 263 | |
| 264 | |
| 265 | |
| 266 | |
| 267 | |
| 268 | |
| 269 | |
| 270 | |
| 271 | |
| 272 | |
| 273 | |
| 274 | |
| 275 | |
| 276 | |
| 277 | |
| 278 | |
| 279 | |
| 280 | |
| 281 | |
| 282 | |
| 283 | |
| 284 | |
| 285 | |
| 286 | |
| 287 | |
| 288 | |
| 289 | |
| 290 | |
| 291 | |
| 292 | |

TRITON - FDA 2 - 005153

| # | Manufacturer Name | |
|---|---|---|
| 293 | (b)(4) | |
| 294 | | |
| 295 | | |
| 296 | | |
| 297 | | |
| 298 | | |
| 299 | | |
| 300 | | |
| 301 | | |
| 302 | | |
| 303 | | |
| 304 | | |
| 305 | | |
| 306 | | |
| 307 | | |
| 308 | | |
| 309 | | |
| 310 | | |
| 311 | | |
| 312 | | |
| 313 | | |
| 314 | | |
| 315 | | |
| 316 | | |
| 317 | | |
| 318 | | |
| 319 | | |
| 320 | | |
| 321 | | |
| 322 | | |
| 323 | | |
| 324 | | |
| 325 | | |
| 326 | | |
| 327 | | |
| 328 | | |
| 329 | | |
| 330 | | |
| 331 | | |
| 332 | | |
| 333 | | |
| 334 | | |

TRITON - FDA 2 - 005154

| # | Manufacturer Name |
|---|---|
| 335 | (b)(4) |
| 336 | |
| 337 | |
| 338 | |
| 339 | |
| 340 | |
| 341 | |
| 342 | |
| 343 | |
| 344 | |
| 345 | |
| 346 | |
| 347 | |
| 348 | |
| 349 | |
| 350 | |
| 351 | |
| 352 | |
| 353 | |
| 354 | |
| 355 | |
| 356 | |
| 357 | |
| 358 | |
| 359 | |
| 360 | |
| 361 | |
| 362 | |

# E-cigarette Use Among Middle and High School Students — United States, 2020

Teresa W. Wang, PhD[1]; Linda J. Neff, PhD[1]; Eunice Park-Lee, PhD[2]; Chunfeng Ren, PhD[2]; Karen A. Cullen, PhD[2]; Brian A. King, PhD[1]

*On September 9, 2020, this report was posted as an* MMWR *Early Release on the* MMWR *website (https://www.cdc.gov/mmwr).*

The use of any tobacco product by youths is unsafe, including electronic cigarettes (e-cigarettes) (*1*). Most e-cigarettes contain nicotine, which is highly addictive, can harm the developing adolescent brain, and can increase risk for future addiction to other drugs (*1*). E-cigarette use has increased considerably among U.S. youths since 2011 (*1,2*). Multiple factors have contributed to this increase, including youth-appealing flavors and product innovations (*1–3*). Amid the widespread use of e-cigarettes and popularity of certain products among youths, on February 6, 2020, the Food and Drug Administration (FDA) implemented a policy prioritizing enforcement against the manufacture, distribution, and sale of certain unauthorized flavored prefilled pod or cartridge-based e-cigarettes (excluding tobacco or menthol).*

CDC and FDA analyzed nationally representative data from the 2020 National Youth Tobacco Survey (NYTS),[†] a cross-sectional, school-based, self-administered survey of U.S. middle school (grades 6–8) and high school (grades 9–12) students conducted during January 16–March 16, 2020.[§] The NYTS study protocol was approved by the CDC institutional review board. Current (past 30-day) e-cigarette use was assessed, overall and by device[¶] and flavor** type. Weighted prevalence estimates and population totals[††] were calculated. Analyses were conducted using SAS-callable SUDAAN (version 11.0.3; RTI International).

In 2020, 19.6% of high school students (3.02 million) and 4.7% of middle school students (550,000) reported current e-cigarette use. Among current e-cigarette users, 38.9% of high school students and 20.0% of middle school students

reported using e-cigarettes on 20 or more of the past 30 days; 22.5% of high school users and 9.4% of middle school users reported daily use. Among all current e-cigarette users, 82.9% used flavored e-cigarettes, including 84.7% of high school users (2.53 million) and 73.9% of middle school users (400,000).

Among high school current e-cigarette users, the most commonly used device type was prefilled pods or cartridges (48.5%; 1.45 million), followed by disposables (26.5%; 790,000), and tanks (14.8%; 440,000). Among middle school current e-cigarette users, the most commonly used device type was prefilled pods or cartridges (41.3%; 220,000), followed by tanks (21.5%; 110,000), and disposables (15.2%; 80,000).

Among high school students who currently used any type of flavored e-cigarettes, the most commonly used flavor types were fruit (73.1%; 1.83 million); mint (55.8%; 1.39 million); menthol (37.0%; 920,000); and candy, desserts, or other sweets (36.4%; 910,000). Among middle school students who currently used any type of flavored e-cigarettes, the most commonly used flavor types were fruit (75.6%; 290,000); candy, desserts, or other sweets (47.2%; 180,000); mint (46.5%; 180,000); and menthol (23.5%; 90,000).

Among current users of flavored prefilled pods or cartridges, the most commonly used flavor types were fruit (66.0%; 920,000); mint (57.5%; 800,000); menthol (44.5%; 620,000); and candy, desserts, or other sweets (35.6%; 490,000) (Figure). Among current users of flavored disposable e-cigarettes, the most commonly used flavor types were fruit (82.7%; 650,000); mint (51.9%; 410,000); candy, desserts, or other sweets (41.7%; 330,000); and menthol (23.3%; 180,000).

In 2020, approximately one in five high school students and one in 20 middle school students currently used e-cigarettes. By comparison, in 2019, 27.5% of high school students (4.11 million) and 10.5% of middle school students

---

* https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.

[†] https://www.cdc.gov/tobacco/data_statistics/surveys/nyts/index.htm.

[§] The data collection timeline was truncated because of widespread school closures during the coronavirus disease 2019 pandemic.

[¶] Device type among current e-cigarette users was determined by answers to the question "Which of the following best describes the type of e-cigarette you have used in the past 30 days? If you have used more than one type, please think about the one you use most often." Response options were "a disposable e-cigarette," "an e-cigarette that uses pre-filled pods or cartridges (e.g., JUUL)," "an e-cigarette with a tank that you refill with liquids," "a mod system (an e-cigarette that can be customized by the user with their own combination of batteries or other parts)," and "I don't know the type."

** Flavored e-cigarette use among current e-cigarette users was determined by answers to the question "Were any of the e-cigarettes that you used in the past 30 days flavored to taste like menthol, mint, clove or spice, alcohol (wine, cognac), candy, fruit, chocolate, or any other flavor?" Response options were "yes," "no," and "don't know." Flavor type use among current e-cigarette users who reported flavored e-cigarette use was determined by answers to the question "What flavors were the e-cigarettes that you have used in the past 30 days? (Select one or more)." Response options were: "menthol," "mint," "clove or spice," "fruit," "chocolate," "alcoholic drinks (such as wine, cognac, margarita, or other cocktails)," "candy, desserts, or other sweets," and "some other flavor not listed here" (write-in responses were not assessed).

[††] Weighted population estimates are rounded down to the nearest 10,000 students.

AA13

**FIGURE. Percentage of flavor types used by current (past 30-day) flavored e-cigarette users among U.S. middle and high school students,\* by device type[†,§] — National Youth Tobacco Survey, United States, 2020**



\* Flavor type use among current (past 30-day) users of flavored e-cigarettes was determined by answers to the question "What flavors were the e-cigarettes that you have used in the past 30 days? (Select one or more)." Response options were "menthol," "mint," "clove or spice," "fruit," "chocolate," "alcoholic drinks (such as wine, cognac, margarita, or other cocktails)," "candy, desserts, or other sweets," and "some other flavor not listed here" (write-in responses were not assessed). Data for "clove or spice" are not shown because of statistically unreliable estimates due to unweighted denominator <50 or relative standard error >30% across all device types.

† Device type use among current e-cigarette users was determined by answers to the question "Which of the following best describes the type of e-cigarette you have used in the past 30 days? If you have used more than one type, please think about the one you use most often." Response options were "a disposable e-cigarette," "an e-cigarette that uses pre-filled pods or cartridges (e.g., JUUL)," "an e-cigarette with a tank that you refill with liquids," "a mod system (an e-cigarette that can be customized by the user with their own combination of batteries or other parts)," and "I don't know the type."

§ The following data were statistically unreliable and not shown due to unweighted denominator <50 or relative standard error >30%: use of chocolate flavor types among current flavored e-cigarette users of disposable e-cigarettes, mod systems, or those who reported "I don't know the type" for device type; alcoholic drink flavor types among current flavored e-cigarette users of mod systems or those who reported "I don't know the type" for device type; and "some other flavor" among current flavored e-cigarette users who reported "I don't know the type" for device type.

(1.24 million) reported current e-cigarette use (2). Although these data reflect a decline in current e-cigarette use since 2019, 3.6 million U.S. youths still currently use e-cigarettes in 2020, and among current users, more than eight in 10 reported using flavored e-cigarettes.

Consistent with 2019, prefilled pods or cartridges were the most commonly used device type in 2020; however, during 2019–2020, disposable e-cigarette use increased approximately 1,000% (from 2.4% to 26.5%) among high school current e-cigarette users and approximately 400% (from 3.0% to 15.2%) among middle school current e-cigarette users. Although use of fruit flavored e-cigarettes was common among users in 2020, findings also suggest prominent menthol e-cigarette use, including among nearly one half of flavored prefilled pod or cartridge users and one quarter of flavored disposable product users.

Comprehensive implementation of evidence-based strategies at the national, state, and local levels, in coordination with FDA regulation, can prevent and reduce youth tobacco product use (1,4,5). Strategies to address factors driving youth e-cigarette use are particularly critical. In addition to FDA's enforcement policy that prohibits the sale of prefilled pod- or cartridge-based e-cigarettes in any flavor other than tobacco or menthol, several states and communities have restricted all flavored e-cigarette sales, including menthol.[§§]

§§ https://www.tobaccofreekids.org/assets/factsheets/0398.pdf.

Corresponding author: Linda J. Neff, len2@cdc.gov, 404-639-3286.

[1]Office on Smoking and Health, National Center for Chronic Disease Prevention and Health Promotion, CDC; [2]Center for Tobacco Products, Food and Drug Administration, Silver Spring, Maryland.

All authors have completed and submitted the International Committee of Medical Journal Editors form for disclosure of potential conflicts of interest. No potential conflicts of interest were disclosed.

AA14

## References

1. US Department of Health and Human Services. E-cigarette use among youth and young adults: a report of the Surgeon General. Atlanta, GA: US Department of Health and Human Services, CDC; 2016. https://www.cdc.gov/tobacco/data_statistics/sgr/e-cigarettes/pdfs/2016_sgr_entire_report_508.pdf

2. Cullen KA, Gentzke AS, Sawdey MD, et al. E-cigarette use among youth in the United States, 2019. JAMA 2019;322:2095–103. https://doi.org/10.1001/jama.2019.18387

3. Leventhal AM, Miech R, Barrington-Trimis J, Johnston LD, O'Malley PM, Patrick ME. Flavors of e-cigarettes used by youths in the United States. JAMA 2019;322:2132–4. https://doi.org/10.1001/jama.2019.17968

4. Office of the Surgeon General. Surgeon General's advisory on e-cigarette use among youth. Washington, DC: US Department of Health and Human Services, Office of the Surgeon General; 2018. https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf

5. US Department of Health and Human Services. Preventing tobacco use among youth and young adults: a report of the Surgeon General. Atlanta, GA: US Department of Health and Human Services, CDC; 2012. https://www.cdc.gov/tobacco/data_statistics/sgr/2012/index.htm

AA15

# Notes from the Field

## E-Cigarette Use Among Middle and High School Students — National Youth Tobacco Survey, United States, 2021

Eunice Park-Lee, PhD[1]; Chunfeng Ren, PhD[1];
Michael D. Sawdey, PhD[1]; Andrea S. Gentzke, PhD[2];
Monica Cornelius, PhD[2]; Ahmed Jamal, MBBS[2]; Karen A. Cullen, PhD[1]

Since 2014, e-cigarettes have been the most commonly used tobacco product among U.S. youths (1). In 2020, an estimated 3.6 million (13.1%) U.S. middle and high school students reported using e-cigarettes within the past 30 days (current use); more than 80% of current users reported flavored e-cigarette use (2). Whereas the most commonly used device type in 2019 and 2020 was a prefilled pod or cartridge,* disposable e-cigarette use increased significantly during this time among youths who currently used e-cigarettes in middle school (from 3.0% to 15.2%) and high school (from 2.4% to 26.5%) (3). CDC and the Food and Drug Administration (FDA) analyzed nationally representative data from the 2021 National Youth Tobacco Survey (NYTS), a school-based, cross-sectional, self-administered survey of U.S. middle school (grades 6–8) and high school (grades 9–12) students conducted during January 18–May 21, 2021 (20,413 students from 279 schools; overall response rate = 44.6%).† Because of the ongoing COVID-19 pandemic, data were collected online to allow participation of eligible students in remote learning settings.§ Current e-cigarette use was assessed overall, by frequency of use, device type, flavors, and usual brand. Weighted prevalence estimates and population totals¶ were calculated. This study was reviewed and approved by the CDC IRB.**

In 2021, 11.3% of high school students (1.72 million) and 2.8% (320,000) of middle school students reported current e-cigarette use (Table). Among current e-cigarette users, 43.6% of high school students and 17.2% of middle school students reported using e-cigarettes on ≥20 of the past 30 days; daily use was 27.6% among current high school e-cigarette users and 8.3% among current middle school e-cigarette users. Among both middle and high school current e-cigarette users, the most commonly used device type was disposables, followed by pre-filled or refillable pods or cartridges and tanks or mod systems. Among high school current e-cigarette users, 26.1% reported that their usual brand was Puff Bar, followed by Vuse (10.8%), SMOK (9.6%), JUUL (5.7%), and Suorin (2.3%). Among middle school current users, 30.3% reported that their usual brand was Puff Bar, and 12.5% reported JUUL. Notably, 15.6% of high school users and 19.3% of middle school users reported not knowing the e-cigarette brand they usually used.

Among current youth e-cigarette users overall, 84.7% used flavored e-cigarettes, including 85.8% of high school users and 79.2% of middle school users. Among all current flavored e-cigarette users, the most commonly used flavor types among both middle and high school students were fruit, followed by candy, desserts, or other sweets; mint; and menthol. When examined by device type used, the most commonly used flavor types among current flavored disposable e-cigarette users were fruit (78.7%; 760,000); candy, desserts, or other sweets (34.3%; 330,000); mint (30.1%; 290,000); and menthol (21.5%; 200,000). The most commonly used flavor types among current flavored pod or cartridge users were fruit (57.9%; 270,000); menthol (46.3%; 210,000); mint (30.7%; 140,000); and candy, desserts, or other sweets (28.2%; 130,000). The most commonly used flavor types among current flavored tanks or mod systems users were fruit (70.9%; 100,000); candy, desserts, or other sweets (51.2%; 70,000); mint (34.5%; 50,000); and menthol (24.7%; 30,000). Among current flavored e-cigarette users, fruit was the most commonly reported flavor type overall, by school level, and across all e-cigarette devices.

The 2021 NYTS was fully conducted amid the global COVID-19 pandemic, during which time eligible students could participate in the survey in classrooms, at home, or

---

* There are a variety of different types of e-cigarette devices that are currently available. Disposable e-cigarettes come prefilled with e-liquid, and the entire device is designed to be discarded after a single use. Other devices have "pods" or "cartridges" that hold the e-liquid. Some pods or cartridges come pre-filled with e-liquid and are replaced after use, while others can be refilled by the user. Tank or mod-type devices can also be refilled by users, but are also usually customizable, allowing the user to change the temperature or voltage, nicotine concentrations, and add accessories to enhance the user experience.

† The final sample consisted of 508 schools, 279 (54.9%) of which participated; among 25,149 students, 20,413 (81.2%) students participated. The overall response rate (44.6%) is the product of the school-level and student-level participation rates. https://www.cdc.gov/tobacco/data_statistics/surveys/nyts/index.htm

§ Because of state and local COVID-19 protocols (e.g., distance or hybrid learning, restrictive travel, or visitor access), the 2021 NYTS data collection was transitioned from an in-person, tablet-based administration to a fully online administration. Eligible students could participate in classrooms, at home, or in some other remote learning environment. Overall, 50.8% of students who completed the 2021 NYTS reported completing the survey in a school building or classroom and 49.2% at home or at some other place. Because of these differences in data collection procedures, the 2021 NYTS estimates should not be compared with previous NYTS survey waves that were primarily conducted on school campuses.

¶ Weighted population estimates were rounded down to the nearest 10,000 students.
** 45 C.F.R. part 46; 21 C.F.R. part 56.

AA16

*Morbidity and Mortality Weekly Report*

**TABLE. Prevalence of past 30-day e-cigarette use,\* overall and by selected characteristics and school level — National Youth Tobacco Survey, United States, 2021**

| Characteristic | Overall | | High school | | Middle school | |
|---|---|---|---|---|---|---|
| | % (95% CI) | Estimated weighted no.[†] | % (95% CI) | Estimated weighted no.[†] | % (95% CI) | Estimated weighted no.[†] |
| **Among all students** | | | | | | |
| Current use of e-cigarettes | 7.6 (6.6–8.7) | 2,060,000 | 11.3 (9.7–13.0) | 1,720,000 | 2.8 (2.2–3.4) | 320,000 |
| **Among current e-cigarette users** | | | | | | |
| **Frequency of e-cigarette use** | | | | | | |
| 1–19 days per month | 60.6 (56.5–64.6) | 1,240,000 | 56.4 (51.8–61.0) | 970,000 | 82.8 (77.4–87.2) | 270,000 |
| 20–30 days per month | 39.4 (35.4–43.5) | 810,000 | 43.6 (39.0–48.2) | 750,000 | 17.2 (12.8–22.6) | 50,000 |
| Daily e-cigarette use[§] | 24.6 (21.8–27.8) | 500,000 | 27.6 (24.3–31.2) | 470,000 | 8.3 (5.6–12.0) | 20,000 |
| **Device type used[¶]** | | | | | | |
| Disposables | 53.7 (48.7–58.6) | 1,080,000 | 55.8 (50.8–60.7) | 940,000 | 43.8 (34.0–54.1) | 130,000 |
| Prefilled or refillable pods or cartridges | 28.7 (25.1–32.6) | 570,000 | 28.9 (24.9–33.3) | 480,000 | 27.8 (22.0–34.4) | 80,000 |
| Tanks or mod systems | 9.0 (6.8–11.8) | 180,000 | 7.5 (5.5–13.0) | 120,000 | 15.6 (9.7–24.1) | 40,000 |
| Don't know | 8.6 (6.7–11.0) | 170,000 | 7.8 (5.7–10.4) | 130,000 | 12.8 (8.0–19.9) | 40,000 |
| **Usual brand\*\*** | | | | | | |
| Puff Bar | 26.8 (22.9–31.1) | 520,000 | 26.1 (22.0–30.6) | 430,000 | 30.3 (21.9–40.3) | 90,000 |
| Vuse | 10.5 (6.9–15.6) | 200,000 | 10.8 (7.1–16.2) | 170,000 | —[††] | — |
| SMOK (including NOVO) | 8.6 (6.4–11.5) | 160,000 | 9.6 (7.1–13.0) | 150,000 | — | — |
| JUUL | 6.8 (4.9–9.3) | 130,000 | 5.7 (3.8–8.5) | 90,000 | 12.5 (8.3–18.4) | 30,000 |
| Suorin | 2.1 (1.2–3.7) | 40,000 | 2.3 (1.3–4.0) | 30,000 | — | — |
| No usual brand | 2.4 (1.5–3.8) | 40,000 | 2.5 (1.5–4.1) | 40,000 | — | — |
| Some other brand not listed | 19.8 (15.7–24.6) | 390,000 | 21.0 (16.5–26.3) | 340,000 | 13.8 (8.6–21.3) | 40,000 |
| Don't know | 16.1 (13.8–18.8) | 310,000 | 15.6 (13.1–18.4) | 250,000 | 19.3 (14.2–25.8) | 60,000 |
| **Flavored e-cigarette use[§§]** | | | | | | |
| Yes | 84.7 (81.4–87.5) | 1,680,000 | 85.8 (82.3–88.7) | 1,420,000 | 79.2 (69.1–86.6) | 250,000 |
| No | 8.8 (6.9–11.2) | 170,000 | 8.4 (6.5–10.7) | 130,000 | 11.1 (6.4–18.7) | 30,000 |
| Don't know | 6.5 (5.0–8.4) | 120,000 | 5.9 (4.3–8.0) | 90,000 | 9.7 (6.3–14.7) | 30,000 |
| **Flavor type used[¶¶]** | | | | | | |
| Fruit | 71.6 (67.8–75.1) | 1,190,000 | 72.3 (68.1–76.1) | 1,010,000 | 68.1 (58.7–76.1) | 160,000 |
| Candy, desserts, or other sweets | 34.1 (30.3–38.2) | 560,000 | 33.0 (29.2–37.1) | 460,000 | 38.8 (30.0–48.3) | 90,000 |
| Mint | 30.2 (26.9–33.7) | 500,000 | 30.5 (27.0–34.2) | 420,000 | 26.7 (19.5–35.4) | 60,000 |
| Menthol | 28.8 (23.6–34.8) | 470,000 | 29.8 (24.2–36.0) | 410,000 | 23.1 (13.8–36.0) | 50,000 |
| Alcoholic drink | 6.0 (4.3–8.2) | 90,000 | 5.0 (3.4–7.5) | 70,000 | 10.3 (5.9–17.3) | 20,000 |
| Chocolate | 2.9 (1.9–4.5) | 40,000 | 2.5 (1.4–4.4) | 30,000 | — | — |
| Clove or spice | 2.1 (1.3–3.3) | 30,000 | — | — | — | — |
| Some other flavor not listed | 10.4 (8.2–13.2) | 170,000 | 9.8 (7.4–12.7) | 130,000 | 13.8 (8.5–21.6) | 30,000 |

**Abbreviation:** CI = confidence interval.

\* Past 30-day use of e-cigarettes was determined by asking, "During the past 30 days, on how many days did you use e-cigarettes?" Current use was defined as use on ≥1 day during the past 30 days.

[†] Estimated total number of users was rounded down to the nearest 10,000 persons. Overall population totals might not sum to corresponding estimates by school level because of rounding or inclusion of students who did not self-report their grade level.

[§] Daily e-cigarette use was defined as reported use on all 30 days during the past 30 days.

[¶] Device type use among current e-cigarette users was determined by answers to the question, "Which of the following best describes the type of e-cigarette you have used in the past 30 days? If you have used more than one type, please think about the one you use most often." Response options were the following: "a disposable e-cigarette (for example, Puff Bar, STIG)," "an e-cigarette that uses pre-filled or refillable pods or cartridges (for example, JUUL, SMOK, or Suorin)," "an e-cigarette with a tank that you refill with liquids (including mod systems that can be customized by the user)," and "I don't know the type."

\*\* Usual brand was determined by two questions. All current e-cigarette users were first asked, "During the past 30 days, what e-cigarette brands did you use? (Select one or more)." Response options were as follows: "blu," "Eonsmoke," "JUUL," "Leap," "Logic," "Mojo," "NJOY," "Posh," "Puff Bar," "SMOK (including NOVO)," "STIG," "Suorin," "Vuse," "Some other brand(s) not listed here," and "Not sure/I don't know the brand." Those who selected more than one option were then asked, "During the past 30 days, what brand of e-cigarettes did you usually use? (Choose only one answer)." The same response options as the first question were available with the additional response option of "I did not use a usual brand." If a single brand was selected in the first question, that brand was reported as their usual brand. Otherwise, the option selected in the second question was recorded as the usual brand. Those who selected "Some other brand(s) not listed here" could provide a write-in response; write-in responses corresponding to an original response option were recoded. Data for blu, Eonsmoke, Leap, Logic, Mojo, NJOY, Posh, and STIG are not shown because of statistically unreliable estimates resulting from an unweighted denominator <50 or a relative standard error >30% overall and at both school levels.

[††] Dashes indicate data were statistically unreliable because of an unweighted denominator <50 or a relative standard error >30%.

[§§] Flavored e-cigarette use was assessed by the question, "Were any of the e-cigarettes that you used in the past 30 days flavored to taste like menthol, mint, clove or spice, alcohol drinks, candy, fruit, chocolate, or any other flavor?" Responses were "yes," no," or "don't know."

[¶¶] Flavor type use among current (past 30-day) users of flavored e-cigarettes was determined by answers to the question, "What flavors were the e-cigarettes that you have used in the past 30 days? (Select one or more)." Response options were "menthol," "mint," "clove or spice," "fruit," "chocolate," "alcoholic drinks (such as wine, margarita, or other cocktails)," "candy, desserts, or other sweets," and "some other flavor not listed here." Those who selected "some other flavor not listed here" could provide a write-in response; write-in responses corresponding to an original response option were recoded.

AA17

at some other place. Differences in tobacco use estimates by location[††] might be due to potential underreporting of tobacco use behaviors or other unmeasured characteristics among youths participating outside of the classroom. Thus, estimates from the 2021 NYTS should not be compared with previous NYTS survey waves that were primarily conducted on school campuses.

Approximately 2.06 million youths were estimated to be current e-cigarette users in 2021. Use of tobacco products by youths in any form, including e-cigarettes, is unsafe. Most e-cigarettes contain nicotine, and nicotine exposure during adolescence can harm the developing brain (5). Ongoing efforts to address youth e-cigarette use, including FDA's prioritized enforcement against certain unauthorized flavored, cartridge-based e-cigarettes in 2020, are critical (4). As the tobacco product landscape continues to evolve, sustained implementation of comprehensive tobacco control and prevention strategies at the national, state, and local levels, coupled with FDA regulation, can reduce and prevent tobacco product initiation and use among youths (5).

---

[††] Youths who reported participating in the 2021 NYTS in a school building or classroom reported a higher prevalence of e-cigarette use compared with youths participating at home or at some other place; 15.0% of high school students who took the survey in a school building or classroom reported currently using e-cigarettes compared with 8.1% of those who took the survey at home or at some other place (p <0.001).

Corresponding author: Eunice Park-Lee, Eunice.Park-Lee@fda.hhs.gov, 301-837-7342.

---

[1]Center for Tobacco Products, Food and Drug Administration, Silver Spring, Maryland; [2]Office on Smoking and Health, National Center for Chronic Disease Prevention and Health Promotion, CDC.

All authors have completed and submitted the International Committee of Medical Journal Editors form for disclosure of potential conflicts of interest. No potential conflicts of interest were disclosed.

## References

1. Arrazola RA, Singh T, Corey CG, et al. Tobacco use among middle and high school students—United States, 2011–2014. MMWR Morb Mortal Wkly Rep 2015;64:381–5. PMID:25879896
2. Wang TW, Neff LJ, Park-Lee E, Ren C, Cullen KA, King BA. E-cigarette use among middle and high school students—United States, 2020. MMWR Morb Mortal Wkly Rep 2020;69:1310–2. PMID:32941408 https://doi.org/10.15585/mmwr.mm6937e1
3. Wang TW, Gentzke AS, Neff LJ, et al. Disposable e-cigarette use among U.S. youth—an emerging public health challenge. N Engl J Med 2021;384:1573–6. PMID:33725431 https://doi.org/10.1056/NEJMc2033943
4. Center for Tobacco Products. Enforcement priorities for electronic nicotine delivery systems (ENDS) and other deemed products on the market without premarket authorization (revised). Silver Spring, MD: US Department of Health and Human Services, Food and Drug Administration; 2020. https://www.fda.gov/media/133880/download
5. CDC. E-cigarette use among youth and young adults. A report of the surgeon general. Atlanta, GA: US Department of Health and Human Services, CDC, Office on Smoking and Health; 2016. https://e-cigarettes.surgeongeneral.gov/documents/2016_SGR_Full_Report_non-508.pdf

AA18

**VTA**
VAPOR TECHNOLOGY
ASSOCIATION

September 14, 2021

**VIA ELECTRONIC MAIL**
Mitch Zeller, Director
Center for Tobacco Products
Document Control Center (DCC)
9200 Corporate Blvd., Room 020J
Rockville, MD 20850

Re:     *FDA's New Standard & Requirements for Evaluating Flavored ENDS PMTAs*

Dear Director Zeller:

I write on behalf of the Vapor Technology Association (VTA) and the open-system industry that is selling e-liquids and devices to adult consumers, particularly adult smokers attempting to quit cigarettes. Our member companies, and many other similarly situated companies, have filed substantial PMTAs for open-system flavored ENDS products after investing heavily in the statutorily required components of a PMTA, including HPHC testing, and other research such as stability testing, toxicological testing, perception surveys, and likelihood of use research to support their applications.  Surely, you must recognize that FDA received numerous applications filed in good faith and containing robust and reliable data, research and information from open-system device and e-liquid companies, and that these applicants' PMTAs were filed with the assistance of recognized expert consultants, scientists, toxicologists, and laboratories with a long history of working with the FDA.

As you know, we have previously raised and discussed our many concerns with you regarding the opacity of the PMTA process, the repeatedly shifting deadlines, and the lack of articulation of what FDA requires in an application. Of course, we recognize that you have published non-binding guidance and a draft PMTA rule.  And we appreciate (and have participated in) the stakeholder meetings and informational sessions. We have offered numerous recommendations via comments on how FDA could appropriately and judiciously apply the PMTA process and achieve the objectives of the Deeming Regulation without eliminating a major segment of the vapor industry, i.e., those selling open-system devices and e-liquids.

Through it all, FDA never suggested that it was going to demand product-specific randomized clinical testing or longitudinal cohort studies as the standard for proving that flavored ENDS products help adults quit smoking.  Yet, FDA's recent public statements associated with the FDA's issuance of Marketing Denial Orders (MDOs) on flavored ENDS, and the MDOs themselves, are clearly articulating a new standard for Pre-Market Tobacco Application (PMTA) review of flavored ENDS products. Not only does FDA's standard retroactively introduce a new product-specific testing requirement, FDA has made that testing requirement a *prerequisite* without which a flavored ENDS PMTA will be rejected.

To evaluate whether a flavored ENDS product is appropriate for the protection of public health, FDA's new standard appears to be based on a premise that is unfounded in science: that *all* flavored ENDS products, regardless of the flavor and device type, are attractive to youth. If that

AA19

were the true, FDA would never have limited its flavor ban last year only to closed-system *pods* and *cartridges*, its rationale for which could not have been clearer: it was these closed-system products – particularly JUUL's products – that were driving the usage rates amongst youth and "of particular concern" were the design characteristics, not simply the presence of flavors:

> "Data from the 2019 NYTS also indicate that youth overwhelmingly prefer cartridge-based ENDS products, and we have found that these products are easy to conceal, can be used discreetly, may have a high nicotine content, and are manufactured on a large scale.... Most youth who were currently e-cigarette users reported a cartridge-based e-cigarette as their usual brand.... Of particular concern are the design features that appear to make the cartridge-based products so popular with young people. Attributes typically present in cartridge-based products include a relatively small size that allows for easy scalability, and intuitive and convenient features that facilitate ease of use, including draw activation, prefilled cartridges or pods, and USB rechargeability."

*See*, Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization, January 2020, pp. 15-16.

Open-system devices share none of the design features that FDA relied upon in removing closed-system device flavors from the market. So, if FDA is in possession of new data which proves that America's youth are using large, complex, cumbersome, inconvenient, impossible to conceal, hard to use discreetly, difficult to access open-systems at any material rate, we would greatly appreciate that data being disclosed publicly. We also note that youth vaping of nicotine in the U.S. has plummeted more that 25% in the latest 2020 NYTS survey making the continued justifications of an "epidemic" entirely misplaced. Moreover, we would not be surprised if the 2021 NYTS survey shows a continuing decline in youth use of ENDS or flavored ENDS generally, and no material use of open system ENDS. Without data, FDA's generalized statement that all flavored ENDS are attractive to youth is simply untethered from fact.

Moreover, any suggestion that FDA is concerned that youth *might* simply switch to open-system flavored ENDS, as they did to disposables after the pod/cartridge ban, is speculative and unscientific. FDA could not have been surprised that youth matriculated to closed-system *disposables* since disposables share the exact same design features as the other flavored closed-systems that FDA banned last year. In fact, disposables are easier to use, easier to conceal, easier to use discreetly, are more intuitive, and are more convenient than pods/cartridges. Since the exact opposite is true for open-system flavors, FDA's experience with disposables offers no justification, much less empirical data, for any concern that youth would take up open-systems if and when FDA eliminates the flavored closed-system disposable exemption it created. *Id.* at p. 9, fn. 20.

FDA's decision to retroactively impose a prerequisite testing requirement, suggests that it is also ignoring the applicant's data that would otherwise prove the age cohorts who use the applicant's specific products and the applicant's history of no or limited youth usage. Our concern is that FDA is ignoring relevant product specific data on youth, but is requiring product specific randomized clinical testing or longitudinal cohort studies proving the benefit to adults, while also requiring that such evidence must be robust enough to overcome the Agency's generalized presumption regarding youth.

One would think that the materially important prerequisite of product-specific randomized clinical testing or longitudinal cohort studies would have been clearly articulated by FDA long before the applications were due and, certainly, if there was any intervening reason to require such testing (which there was not), long before this month when numerous denials were issued without giving companies, via a deficiency letter, any opportunity to even attempt to comply.

Objectively, the only thing that has changed recently (other than the material decline in youth vaping rates) is the cacophony from Congress and special interest groups who have made it their mission to harangue the FDA publicly at hastily called hearings with an expressly stated intent to interfere with FDA's regulatory process. These same individuals and groups have turned up the pressure on FDA, demanding that FDA ignore the science altogether by banning all flavors outright or by rejecting certain PMTAs regardless of the science submitted with that PMTA.

However, companies which have invested heavily in the FDA's articulated regulatory process have done so in good faith expecting FDA to resist political pressures and dedicate itself to the science. These companies expected that FDA would fairly and consistently apply the standards that it has presented to the industry for the past two years and not move the proverbial goal posts at the last minute, just to end the game quickly. These companies also expected that FDA would at some point give *at least equal weight* in its balancing test to the millions of adult smokers, who are actually dying from smoking cigarettes, as it gives to the perceived and still attenuating risk to youth who experiment with vaping.

FDA's recent actions and inactions are inconsistent with FDA's own guidance, with FDA's draft rule, and with FDA's specific public and private statements to companies who are attempting to comply with the PMTA process in good faith. While FDA may have other unarticulated reasons for denying the applications that it has recently rejected, FDA's dramatic shift in denying outright open-system flavored ENDS applications for lack of product-specific testing suggests that FDA has made a policy decision to remove all flavored ENDS products from the market one application at a time without a full review of the PMTA itself.

At the same time, despite providing detailed information at a June 2021 presentation to all stakeholders on how FDA was prioritizing its PMTA review on JUUL's and the Big Tobacco companies' PMTAs and would be render its decisions by September 9, 2021, and despite the Acting Commissioner testifying before Congress to the same, the Agency has failed to render any decisions on these closed-system products (whether or not flavored). Yet, these are the decisions that FDA said would have the greatest impact on public health given these products' dominance of the marketplace. The fact that FDA has changed its focus to the categorical denial of open-systems is now gravely concerning on many levels and we respectfully request a meeting with you to discuss our concerns.

Respectfully submitted on behalf of,

VAPOR TECHNOLOGY ASSOCIATION

Tony Abboud
Executive Director

AA21



## Technical Project Lead (TPL) Review of PMTAs

| New Products Subject of this Review[i] | |
|---|---|
| Submission tracking number (STNs) | (b) (4)     See Appendix A |
| **Common Attributes** | |
| Submission date | September 7, 2020 |
| Receipt date | September 7, 2020 |
| Applicant | (b) (4) |
| Product manufacturer | (b) (4) |
| Application type | Standard |
| Product category | ENDS (VAPES) |
| Product subcategory | ENDS Component |
| **Cross-Referenced Submission** | |
| All new products | None |
| **Recommendation** | |
| Issue marketing denial orders for the new tobacco products subject of this review. | |

**Technical Project Lead (TPL):**

> Digitally signed by David B. Portnoy -S
> Date: 2021.09.17 10:42:36 -04'00'

David B. Portnoy, Ph.D., M.P.H.
Branch Chief, Social Science Branch 2
Division of Population Health Science

**Signatory Decision:**          Concur with TPL recommendation and basis of recommendation

> Digitally signed by Matthew R. Holman -S
> Date: 2021.09.17 10:59:24 -04'00'

Matthew R. Holman, Ph.D.
Director
Office of Science

---

[i] Product details, amendments, and dates provided in the Appendix. PMTA means premarket tobacco application.  Scientific references (if any) are listed at the end of this document and referred to with Arabic numerals; general footnotes are referred to with Roman numerals.

**TABLE OF CONTENTS**

1. EXECUTIVE SUMMARY ............................................................................................................... 3

2. BACKGROUND ........................................................................................................................... 4
    2.1. NEW PRODUCTS ................................................................................................................... 4
    2.2. REGULATORY ACTIVITY ....................................................................................................... 4
    2.3. BASIS FOR REQUIRING RELIABLE, ROBUST EVIDENCE TO DEMONSTRATE BENEFIT ...................... 4
        2.3.1. The Risk to Youth of Flavored ENDS Products ................................................................. 5
        2.3.2. Balancing Known Risks to Youth with a Potential Benefit to Adults ............................... 9
    2.4. SCOPE OF REVIEW ............................................................................................................. 13

3. SCIENTIFIC REVIEW ................................................................................................................. 14

4. ENVIRONMENTAL DECISION ................................................................................................... 14

5. CONCLUSION AND RECOMMENDATION ................................................................................. 14

6. APPENDIX ............................................................................................................................... 16

7. REFERENCES ........................................................................................................................... 17

AA23

## 1. EXECUTIVE SUMMARY

These applications for flavored ENDS[ii] products lack evidence to demonstrate that permitting the marketing of these products would be appropriate for the protection of the public health (APPH). Given the known and substantial risk of flavored ENDS with respect to youth appeal, uptake, and use, applicants would need reliable and robust evidence of a potential benefit to adult smokers[iii] that could justify that risk. Accordingly, in order to show that a flavored ENDS is APPH, the applicant must show that the benefit to adults switching from or reducing cigarettes outweighs the risk to youth.

Based on existing scientific evidence and our experiences in conducting premarket review employing the APPH standard over the last several years, FDA has determined for these applications that, to effectively demonstrate this benefit in terms of product use behavior, only the strongest types of evidence will be sufficiently reliable and robust —most likely product specific evidence from a randomized controlled trial (RCT)[iv] or longitudinal cohort study, although other types of evidence could be adequate, and will be evaluated on a case-by-case basis.[v,vi] Moreover, tobacco-flavored ENDS may offer the same type of public health benefit as flavored ENDS, i.e., increased switching and/or significant reduction in smoking, but do not pose the same degree of risk of youth uptake. Therefore, to demonstrate the potential benefit to current users, FDA has reviewed these applications for any acceptably strong evidence that the flavored products have an added benefit relative to that of tobacco-flavored ENDS in facilitating smokers completely switching away from or significantly reducing their smoking.

We have reviewed the subject applications to determine whether they contain sufficient evidence of the type described above to demonstrate APPH. Our review determined that the applications do <u>not</u> contain evidence from a randomized controlled trial or longitudinal cohort study regarding the impact of the ENDS on switching or cigarette reduction that could potentially demonstrate the benefit of their flavored ENDS over tobacco-flavored ENDS. The PMTAs do contain other evidence regarding the potential benefit to adult users; however, for the reasons explained below, this other evidence is not adequate.

---

[ii] The term *flavored ENDS* in this review refers to any ENDS other than tobacco-flavored and menthol-flavored ENDS. Tobacco-flavored ENDS are discussed below. Applications for menthol-flavored ENDS will be addressed separately. When it comes to evaluating the risks and benefits of a marketing authorization, the assessment for menthol ENDS, as compared to other non-tobacco-flavored ENDS, raises unique considerations. The term *flavored ENDS* also includes unflavored "base" e-liquids that are designed to have flavors added to them. This includes e-liquids made for use with open systems as well as closed system ENDS (e.g., cartridges or disposable ENDS) containing e-liquids.

[iii] The standard described in Section 910 requires an accounting of the risks and benefits to the population as a whole, balancing the potential impacts to both current tobacco users and non-users. This review is focused on the risk to youth nonusers as well as the potential benefit to adult smokers as current users, as they are the group through which the potential benefit to public health is most substantial and could overcome the known risk to youth.

[iv] A randomized controlled trial is a clinical investigation or a clinical study in which human subject(s) are prospectively, and randomly assigned to one or more interventions (or no intervention) to evaluate the effect(s) of the intervention(s) on behavioral, biomedical, or health-related outcomes. *Control or controlled* means, with respect to a clinical trial, that data collected on human subjects in the clinical trial will be compared to concurrently collected data or to non-concurrently collected data (*e.g.,* historical controls, including a human subject's own baseline data), as reflected in the pre-specified primary or secondary outcome measures.

[v] A longitudinal cohort study is an observational study in which human subjects from a defined population are examined prospectively over a period of time to assess an outcome or set of outcomes among study groups defined by a common characteristic (e.g., smoking cessation among users of flavored ENDS compared with users of tobacco-flavored ENDS).

[vi] For example, we would consider evidence from another study design if it could reliably and robustly assess behavior change (product switching or cigarette reduction) over time, comparing users of flavored products with those of tobacco-flavored products. In our review of PMTAs for flavored ENDS so far, we have learned that, in the absence of strong evidence generated by directly observing the behavioral impacts of using a flavored product vs. a tobacco-flavored product over time, we are unable to reach a conclusion that the benefit outweighs the clear risks to youth.

As a result, the applicant has failed to provide evidence to overcome the risk to youth and show a net population health benefit necessary to determine that permitting the marketing of the new tobacco product is APPH.

## 2. BACKGROUND

### 2.1. NEW PRODUCTS

The applicant submitted information for the new products listed on the cover page and in Appendix A.

### 2.2. REGULATORY ACTIVITY

FDA issued an Acceptance letter to the applicant on October 8, 2020. FDA issued a Filing letter to the applicant on November 9, 2020.

### 2.3. BASIS FOR REQUIRING RELIABLE, ROBUST EVIDENCE TO DEMONSTRATE BENEFIT

The rationale for FDA's decision for these flavored ENDS applications is consistent with previous decisions for other flavored ENDS and is set forth below.

The Federal Food, Drug, and Cosmetic Act (FD&C Act or Act) requires that "new tobacco products" receive marketing authorization from FDA under one of the pathways specified by the Act in order to be legally marketed in the United States.  Under one pathway, the applicant submits a PMTA to FDA.  Section 910 of the FD&C Act requires that, for a product to receive PMTA marketing authorization, FDA must conclude, among other things, that the marketing of the product is APPH. The statute specifies that, in assessing APPH, FDA consider the risks and benefits to the population as a whole including both tobacco users and nonusers, taking into account the increased or decreased likelihood that existing users of tobacco products will stop using such products and the increased or decreased likelihood that those who do not use tobacco products will start using such products.[vii]

It is well recognized that ENDS, and particularly flavored ENDS, pose a significant risk to nonusers, especially youth.[1,2]  After observing a dramatic increase in the prevalence of ENDS use among U.S. youth in 2018, FDA's Commissioner characterized the problem as a youth vaping epidemic.  FDA has initiated a series of actions to address the risk and reduce youth use.  Since August 2016, FDA has issued more than 10,000 warning letters and more than 1,400 civil money penalty complaints to retailers for the sale of ENDS products to minors.  FDA has also issued a guidance that described a policy of prioritizing enforcement of non-tobacco/non-menthol flavored ENDS, "Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market without Premarket Authorization" (2020 Enforcement Priorities Guidance).  In this guidance, FDA described evidence that shows flavors (other than tobacco and menthol) were a key driver of

---

[vii] This review focuses on risk to youth nonusers and the potential benefit to adult smokers as current tobacco product users, given that these are the subpopulations that raise the most significant public health concerns and therefore are the most relevant in evaluating the impact on the population as a whole.  FDA has also considered the APPH standard with respect to the likelihood that an authorization will increase or decrease the number of tobacco users in the overall population.  The availability of such products has generally led to greater tobacco use among youth overall, notwithstanding the decrease in cigarette smoking for youth, which reinforces the focus in this review on having sufficiently reliable and robust evidence to justify authorization of these PMTAs.  Cullen, K.A., B.K. Ambrose, A.S. Gentzke, et al., "Notes from the Field: Increase in e-cigarette use and any tobacco product use among middle and high school students – United States, 2011-2018," Morbidity and Mortality Weekly Report, 67(45);1276-1277, 2018.

the surge in ENDS use among youth and thus prioritized enforcement against certain flavored ENDS products, with the goal of protecting youth from these products.[viii]

After FDA implemented this enforcement policy prioritizing enforcement against a subset of ENDS products known to appeal to youth, there was a meaningful reduction in youth use prevalence. Youth ENDS use peaked in 2019 when these products were widely available. Although several other policy changes and interventions were occurring during this same time period,[ix] it is reasonable to infer that prioritizing enforcement against many flavored products resulting in their removal from the market contributed to the decline in use in 2020. Despite this decline, ENDS remained the most widely used tobacco product among youth, with youth use at levels comparable to what originally led FDA to declare a youth vaping epidemic. Moreover, despite the overall reduction in ENDS youth use observed in 2020, there was simultaneously a substantial rise in youth use of disposable ENDS, products that were largely excluded from the enforcement policy described in the 2020 Enforcement Priorities Guidance because, at that time that policy was developed, those products were the least commonly used device type among high school ENDS users and therefore remained on the market as a flavored option.[3,4]

Section 910(c)(2)(A) of the FD&C Act requires that FDA deny a PMTA where it finds "there is a lack of a showing that permitting such tobacco product to be marketed would be [APPH]." Through the PMTA review process, FDA conducts a science-based evaluation to determine whether marketing of a new tobacco product is APPH. Section 910(c)(4) requires FDA, in making the APPH determination, to consider the risks and benefits to the population as a whole, including users and nonusers of tobacco, and take into account, among other things, the likelihood that those who do not use tobacco products will start using them. FDA's scientific review is not limited to considering only information in a PMTA, but also extends to any other information before the Agency, including the relevant existing scientific literature (See Section 910(c)(2)). As described in greater detail below, in reviewing PMTAs for flavored ENDS, FDA evaluates, among other things, the potential benefit to adult smokers who may transition away from combustible cigarettes to the ENDS product, weighed against the known risks of flavored ENDS to youth.

### 2.3.1.    The Risk to Youth of Flavored ENDS Products

As noted, the APPH determination includes an assessment of the risks and benefits to the population as a whole, and for ENDS (as well as many other tobacco products) the application of that standard requires assessing the potential impact of the marketing of a new product on youth use. As a group, youth are considered a vulnerable population for various reasons, including that the majority of tobacco use begins before adulthood[5] and thus youth are at particular risk of tobacco initiation. In fact, use of tobacco products, no matter what type, is almost always started and established during adolescence when the developing brain is most vulnerable to nicotine addiction. Indeed, almost 90 percent of adult daily smokers started smoking by the age of 18.[6] Adolescent tobacco users who initiated tobacco use at earlier ages were more likely than those initiating at older ages to report symptoms of tobacco dependence, putting them at greater risk for maintaining tobacco product use into adulthood.[7] On the other hand, youth and young adults who

---

[viii] Due to the overwhelming amount of evidence showing a substantial increase in youth use of flavored ENDS products, as well as their demonstrated popularity among youth, in January 2020, FDA finalized a guidance prioritizing enforcement against flavored (other than tobacco or menthol) prefilled pod or cartridge-based e-cigarettes, as well as other categories of unauthorized products.

[ix] The change in ENDS product availability coincided with other events such as the enactment of legislation raising the federal minimum age for sale of tobacco products from 18 to 21 years (Tobacco 21), the outbreak of e-cigarette, or vaping, product-use associated lung injury (EVALI), and public education campaigns which also may have contributed to the decline in ENDS use.

reach the age of 26 without ever starting to use cigarettes will most likely never become a daily smoker.[6]  Because of the lifelong implications of nicotine dependence that can be established in youth, preventing tobacco use initiation in young people is a central priority for protecting population health.

### 2.3.1.1. Youth use of flavored ENDS

ENDS are now the most commonly used type of tobacco product among youth.  In 2020, approximately 19.6% of U.S. high school students and 4.7% of middle school students were current users of ENDS, corresponding to 3.6 million youth and making ENDS the most widely used tobacco product among youth by far.[8]  As noted above, this was a decline from 2019, when 27.5% of high school and 10.5% of middle school students reported ENDS use,[9] which necessitated the FDA enforcement policy described above.

The evidence shows that the availability of a broad range of flavors is one of the primary reasons for the popularity of ENDS among youth.  The majority of youth who use ENDS report using a flavored ENDS product, and the use of flavored ENDS has increased over time.  In the 2014 National Youth Tobacco Survey (NYTS), 65.1% of high school and 55.1% of middle school e-cigarette[x] users reported using a flavored e-cigarette.[10]  By the 2020 NYTS, the proportion of e-cigarette users reporting using a flavored product[xi] increased to 84.7% of high school users and 73.9% of middle school users.[3]  Among high school e-cigarette users, the most common flavors used in 2020 were fruit (73.1%); mint (55.8%); menthol (37.0%); and candy, dessert, or other sweets (36.4%).[3]  Among middle school e-cigarette users, the most common flavors used in 2020 were fruit (75.6%); candy, desserts, or other sweets (47.2%); mint (46.5%); and menthol (23.5%).[3]

Youth ENDS users are also more likely to use flavored ENDS compared to adult ENDS users.  In PATH Wave 5.5 from 2020, 66.8% of youth ENDS users aged 13 to 17 reported using fruit, followed by 53.8% for mint/menthol[xii], 23.5% for candy/dessert/other sweets, and 13.3% for tobacco flavor (internal analysis).  In the 2020 PATH Adult Telephone Survey, 51.5% of adult ENDS users 25 and older used fruit, 30.4% used mint/menthol, 23.8% used candy/dessert/other sweets, and 22.3% used tobacco flavor (internal analysis).  Youth current ENDS users were also more likely than adult current ENDS users to use more than one flavor and to use combinations that did not include tobacco flavors.[11]

Studies show that flavors influence youth initiation of ENDS use.  In particular, data show that flavors are associated with product initiation, with the majority of users reporting that their first experience with ENDS was with a flavored product.  For instance, in Wave 1 of the PATH Study from 2013-2014, over 80% of youth aged 12-17, 75% of young adults 18-24, and 58% of adults 25 and older reported that the first e-cigarette that they used was flavored.[12]  In another PATH study, more youth, young adults and adults who initiated e-cigarette use between Wave 1 and Wave 2 reported use of a flavored product than a non-flavored product.[13]  Finally, in PATH Wave 4 from 2016-2017, 93.2% of youth and 83.7% of young adult ever ENDS users reported that their first ENDS product was flavored compared to 52.9% among adult ever users 25 and older.[14]

In addition, nationally representative studies find that when asked to indicate their reasons for using ENDS, youth users consistently select flavors as a top reason.[15,16]  In fact, among Wave 4 youth current ENDS users, 71% reported using ENDS "because they come in flavors I like."[14]

---

[x] We use "e-cigarette" here to be consistent with the survey, but we interpret it to have the same meaning as ENDS.
[xi] Flavored product use in these studies means use of flavors other than tobacco.
[xii] The PATH Study Questionnaire from Wave 5.5 did not assess mint and menthol separately. However, subsequent data collections (ATS and Wave 6) have separated the two flavors.

One explanation for this high prevalence and increase in frequency of use is that flavors can influence the rewarding and reinforcing effects of e-liquids, thereby facilitating ENDS use and increasing abuse liability.  Research shows that flavored ENDS are rated as more satisfying than non-flavored ENDS, and participants will work harder for and take more puffs of flavored ENDS compared to non-flavored ENDS.[17]  Research also shows that flavors can increase nicotine exposure by potentially influencing the rate of nicotine absorption through pH effects and by promoting the reward of ENDS use.[18]  Together, this evidence suggests flavored ENDS may pose greater addiction risk relative to tobacco-flavored ENDS, which increases concerns of addiction in youth, particularly due to the vulnerability of the developing adolescent brain, which is discussed further below.

Finally, existing literature on flavored tobacco product use suggests that flavors not only facilitate initiation, but also promote established regular ENDS use.  In particular, the flavoring in tobacco products (including ENDS) make them more palatable for novice youth and young adults, which can lead to initiation, more frequent and repeated use, and eventually established regular use.  For example, regional studies have found that the use of flavored e-cigarettes was associated with a greater frequency of e-cigarettes used per day among a sample of adolescents in Connecticut in 2014[19] and continuation of e-cigarette use in a sample of adolescents in California from 2014-2017.[20]  Use of non-traditional flavors (vs. tobacco, mint/menthol, flavorless) was associated with increased likelihood of continued use and taking more puffs per episode.[20]  Data from a regional survey in Philadelphia, PA found initial use of a flavored (vs. unflavored or tobacco-flavored) ENDS was associated with progression to current ENDS use as well as escalation in the number of days ENDS were used across 18 months.[21]  Finally, similar effects have been found in the nationally representative PATH study among young adults (18-24 years), where "ever use" of flavored e-cigarettes at Wave 1 was also associated with increased odds of current regular ENDS use a year later at Wave 2.[22]  In sum, flavored ENDS facilitate both experimentation and progression to regular use, which could lead to a lifetime of nicotine dependence.

### 2.3.1.2. The appeal of flavors across ENDS devices

The role of flavors in increasing the appeal of tobacco products to youth — across tobacco product categories — is well-established in the literature.[23-26]  The published literature is sufficient to demonstrate the substantial appeal to youth of flavored ENDS, because it is robust and consistent.  As described above, the preference for use of flavored ENDS among youth is consistently demonstrated across large, national surveys and longitudinal cohort studies.

National surveillance data suggest that, within the ENDS category, there is variability in the popularity of device types among youth, suggesting there may be differential appeal of certain product styles.  Still, across these different device types, the role of flavor is consistent.  As described above, the majority of youth ENDS use involves flavored products: in 2020, the majority of high school and middle school current e-cigarette users reported use of non-tobacco-flavored products (82.9%)[3] and flavored use was favored among both users of closed (87%) and open (76%) ENDS (internal analysis).  In particular, across device types, including prefilled pods/cartridges, disposables, tanks, and mod systems, fruit was the most commonly used flavor type among youth, with 66.0% for prefilled pods/cartridges, 82.7% for disposables, 81.7% for tanks, and 78.9% for mod systems among youth reporting using a fruit flavor.[3]

It is also worth noting that the preference for device types and popularity of certain styles is likely fluid and affected by the marketplace, that is, the options, especially flavors, that are available for consumers to choose from.  Some evidence for this was observed in the trends both leading up to, and coinciding with, the shifting marketplace following the 2020 Enforcement Priorities Guidance.  In particular, the enormous rise in youth ENDS use from 2017-2019 coincided with the ascendance

of JUUL (and copy-cat devices) in the marketplace, suggesting a relationship between the availability of JUUL as an option, and the sudden popularity of pod-based devices.[xiii]  Then, as noted earlier, when FDA changed its enforcement policy to prioritize pod-based flavored ENDS, which were most appealing to youth at the time, we subsequently observed a substantial rise in use of disposable flavored ENDS[xiv]--a ten-fold increase (from 2.4% to 26.5%) among high school current e-cigarette users.[4]  This trend illustrates that the removal of one flavored product option prompted youth to migrate to another ENDS type that offered the desired flavor options, underscoring the fundamental role of flavor in driving appeal.

### 2.3.1.3. The harms of youth ENDS use: The adolescent brain and risk for addiction

In addition to the high prevalence of youth ENDS use, the data also suggest this use is leading to increases in nicotine dependence.[10]  Indeed, responding to concerns related to youth ENDS dependence, at the end of 2018, FDA held a public hearing to discuss the potential role of drug therapies to support e-cigarette cessation.[xv]

In 2019, an estimated 30.4% of middle and high school student ENDS users reported frequent use (i.e., use on ≥20 of the past 30 days).[9]  By school type, 34.2% (95% CI, 31.2%-37.3%) of high school student ENDS users and 18.0% (95% CI, 15.2%-21.2%) of middle school student ENDS users reported frequent use.[27]  Among current ENDS users, 21.4% of high school users and 8.8% of middle school users reported daily ENDS use.[27]  Additionally, in a study that examined changes in ENDS use in youth ages 13-18 over a 12-month period, nicotine dependence (measured using the Penn State Electronic Cigarette Dependence Index (PS-ECDI)[28,29] and salivary cotinine concentrations increased, indicating continued ENDS use and greater nicotine exposure over time.[30]

Youth and young adult brains are more vulnerable to nicotine's effects than the adult brain due to ongoing neural development.[31,32]  Adolescence is a developmental period consisting of major neurobiological and psychosocial changes and is characterized by increased reward-seeking and risk-taking behaviors (e.g., experimentation with drugs), coupled with heightened sensitivity to both natural and drug rewards and an immature self-regulatory system that is less able to modulate reward-seeking impulses (e.g., diminished harm avoidance, cognitive control, self-regulation).[33-37]  Furthermore, evidence from animal studies suggests that nicotine exposure during adolescence enhances the rewarding and reinforcing effects of nicotine in adulthood [38-41]; and can induce short and long-term deficits in attention, learning, and memory.[42-45]

### 2.3.1.4. Risk of progression from ENDS to other tobacco products of different health risk

Among youth who use ENDS, there is a risk of progression to other tobacco products of generally greater health risk.  A 2017 systematic review and meta-analysis that summarized nine prospective cohort studies found significantly higher odds of smoking initiation (OR = 3.50, 95% CI: 2.38, 5.16) and past 30-day combusted cigarette use (OR = 4.28, 95% CI: 2.52, 7.27) among youth who had used ENDS at compared to youth who had not used ENDS.[46]  Similar associations have been observed in longitudinal studies that have been published since the Soneji et al. review.[42,47-56]  The 2018 NASEM report concluded that there is substantial evidence that ENDS use increases risk of ever using combusted tobacco cigarettes among youth and young adults.[57]  The transition from non-cigarette

---

[xiii] This is borne out by the data from 2019 NYTS, in which 59.1% of high school ENDS users reported use of this one brand. Cullen KA, Gentzke AS, Sawdey MD, et al. e-Cigarette Use Among Youth in the United States, 2019. Jama. 2019;322(21):2095-2103.

[xiv] In July 2020, FDA issued Warning letters to three companies for illegally marketing disposable e-cigarettes and for marketing unauthorized modified risk tobacco products.

[xv] On December 5, 2018, FDA hosted a public hearing on "Eliminating Youth Electronic Cigarette and Other Product Use: The Role of Drug Therapies."

product use to combusted cigarette use has been observed for other non-cigarette products, such as cigars, as well.[58]  Although it is challenging to empirically separate causality from shared risk factors among youth combusted cigarette and ENDS users, some studies have found an association between ENDS and subsequent combusted cigarette use while controlling for similar risk profiles.[54]

The precise relationship between youth ENDS use and youth smoking remains undetermined.  On the one hand, the prevalence of combusted cigarette smoking in youth has continued to decline,[9,59,60] suggesting that youth use of ENDS has not significantly slowed or impeded that positive public health trajectory.  On the other hand, there is a growing body of evidence showing a link between ENDS use and subsequent smoking among youth that raises significant concerns.  This evidence also increases concern that over time—and particularly if youth ENDS use were to return to the rates seen in 2019 or worsen--the trend of declining cigarette smoking could slow or even reverse.

### 2.3.1.5. Other health risks associated with ENDS use

In addition to the risk of tobacco initiation and progression among youth, there is epidemiologic evidence from the cross-sectional[xvi] Behavioral Risk Factor Survey system (BRFSS) suggesting positive associations between ENDS use among those who never smoked and some health outcomes.  Two studies found associations between ENDS use and self-reported history of asthma, chronic bronchitis, emphysema, or chronic obstructive pulmonary disease with increased ENDS use (i.e., daily use) relating to increased odds of disease.[61,62]  Another found an association between ENDS use and respiratory symptoms in younger adults (ages 18-34) but not in older adults.[63]  ENDS use has also resulted in acute harm to individuals through battery explosion-related burns and e-liquid nicotine poisoning.[64-66]  Ultimately, as this is still a relatively novel product category, much remains unknown about other potential long-term health risks.

### 2.3.1.6. Conclusion

The exponential growth in youth ENDS use observed from 2017 to 2019, and the enduring prevalence of youth ENDS use in the U.S. is alarming.  Despite a reduction in youth use of ENDS from 2019 to 2020, there were still 3.6 million youth ENDS users in 2020 and the majority used a flavored ENDS product.  Youth users are more likely to use flavored ENDS than adult ENDS users.  Flavors are associated with ENDS initiation and progression among youth.  The full extent of the harms of ENDS use are not yet known, but evidence to date suggests they include permanent effects of nicotine on the developing adolescent brain and the risk of nicotine addiction.  Studies indicate an additive effect of e-liquid flavorings on the rewarding and reinforcing effects of nicotine containing e-liquids.  Studies also demonstrate that e-liquid flavors affect nicotine exposure.  Among youth who use ENDS, there is a risk of progression to other tobacco products with greater health risks including combustible cigarettes.  Finally, though long-term health risks are not fully understood, studies suggest an association between never-smoking ENDS users and respiratory and cardiovascular health effects.  This evidence demonstrates that flavored ENDS pose a significant risk to youth.

### 2.3.2. Balancing Known Risks to Youth with a Potential Benefit to Adults

Determining whether marketing a new product is APPH includes evaluating the risks and benefits to the population as a whole.  This requires FDA to balance, among other things, the negative public health impact for nonusers against the potential positive public health impact for current tobacco users.  Accordingly, for marketing of a new product to be found to be APPH, any risks posed by a new product to youth would need to be overcome by a sufficient benefit to adult users, and as the

---

[xvi] Cross-sectional surveys examine these relationships at a single point in time, and as a result, do not establish causality.

known risks increase, so too does the burden of demonstrating a substantial enough benefit.  In the case of a new flavored ENDS product, the risk of youth initiation and use is substantial, given the clearly documented evidence described above.  In order for marketing of a new flavored ENDS product to be found APPH, an applicant would have to show that the significant risk to youth could be overcome by likely benefits substantial enough such that the net impact to public health would be positive, taking into account all relevant evidence and circumstances, including whether there are effective limitations on youth access.

### 2.3.2.1. Potential benefit of new flavored ENDS

Current scientific literature demonstrates that ENDS are generally likely to have fewer and lower concentrations of harmful and potentially harmful constituents (HPHCs) than combustible cigarettes, and biomarker studies demonstrate significantly lower exposure to HPHCs among current exclusive ENDS users than current smokers.[57]  However, whether this is true for any particular new ENDS product, and the implications for health risks from a particular product, are considered on a case-by-case basis during the course of FDA's scientific review of a PMTA.

FDA also considers the potential that current cigarette smokers may experience a reduction in health risks if they switch completely to an ENDS, or if they use both products but substantially reduce their cigarette smoking.  For a flavored ENDS product, assuming that the evaluation of the product shows the likelihood for lower HPHC exposure, then to demonstrate the likely individual and population benefit, applicants must demonstrate that current smokers are likely to start using the new ENDS product exclusively or predominantly (e.g., dual use with a significant smoking reduction).[64]

### 2.3.2.2. Behavioral evidence appropriate to demonstrate the potential benefit to smokers

FDA's PMTA review includes an evaluation of any potential benefits of the product for the likely users, such as a possible reduction in health risks.  In general, as FDA stated in its guidance for PMTAs for ENDS,[xvii] an assessment of how a new product may be used by current smokers can be derived from a variety of sources.  FDA may consider direct behavioral evidence on the specific products under review or indirect evidence derived from studies of behavioral intentions; pharmacological studies of nicotine delivery, abuse liability, and/or use topography; and bridging from studies based on comparable products.  Further, in the case of a flavored ENDS product, to demonstrate that the marketing of the new product is APPH, the magnitude of the likely benefit would have to be substantial enough to overcome the significant risk of youth uptake and use posed by the flavored ENDS product.

Section 910(c)(5) of the FD&C Act provides that determining whether marketing of a new tobacco product is APPH shall, when appropriate, be based on "well-controlled investigations, which may include one or more clinical investigations by experts qualified by training and experience to evaluate the tobacco product."  FDA believes well-controlled investigations are "appropriate" for demonstrating that permitting the marketing of specific flavored ENDS would be APPH given the significant risks to youth of flavored ENDS.  One type of well-controlled investigation that could effectively demonstrate a potential benefit of a flavored ENDS product would be an RCT.  In addition, as CTP has previously described,[xviii] another well-controlled investigation that could serve as an alternative to conducting an RCT to demonstrate adequate benefit is a longitudinal cohort study.

---

[xvii] Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems: Guidance for Industry (p.47); October 2019 Public Meeting on Deemed Tobacco Product Applications
[xviii] Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems: Guidance for Industry (p.47); October 2019 Public Meeting on Deemed Tobacco Product Applications

For flavored ENDS, the known and substantial risk to youth in particular is high.  Therefore, to show a net population health benefit, FDA has determined that these applications must demonstrate potential benefits to smokers from marketing such products with robust and reliable evidence – including both robust study design and methods and the strength of the study results.  In other words, because the potential benefit to adults is gained through its impact on smoking behavior, FDA is reviewing these applications to determine whether they demonstrate that a benefit of a new product is significant enough to overcome the risk to youth.  In particular, FDA's review of these applications has considered the degree of benefit to a flavored ENDS product over a tobacco-flavored variety in facilitating smokers completely switching or significantly reducing their smoking, given the significant increase in risk of youth initiation associated with flavored ENDS compared to tobacco-flavored ENDS.  Note that applications with this type of information may still not be APPH: applications containing this evidence would still be evaluated to determine that the totality of the evidence supports a marketing authorization.  As it relates to the risk to youth, for example, this assessment includes evaluating the appropriateness of the proposed marketing plan.[xix]

We have been using the APPH standard for several years in reviewing previous PMTAs for non-ENDS products.  Our substantive review of PMTAs for ENDS and our completion of numerous scientific reviews over the last 10 months have deepened our understanding of the APPH evaluation with respect to behavior.  In these reviews, the expectations for scientific evidence related to potential adult benefit can vary based on demonstrated risk to youth.  Although indirect evidence or bridged data from the literature may still be appropriate for many new products, including tobacco-flavored ENDS, robust and direct evidence demonstrating potential benefit has been needed when the known risks are high as with all flavored ENDS products.  At the same time, we have learned from experience that, in the absence of strong direct evidence, we are unable to reach a conclusion that the benefit outweighs the clear risks to youth.  For instance, applicants who do not conduct their own behavioral studies must rely on, and bridge to, the general ENDS category literature to inform an evaluation of the potential benefit to adult users.  To date, that approach has not been sufficient in our evaluation of flavored ENDS PMTAs because, in contrast to the evidence related to youth initiation—which shows clear and consistent patterns of real-world use that support strong conclusions--the evidence regarding the role of flavors in promoting switching among adult smokers is far from conclusive.[xx]  In fact, the findings are quite mixed and as a result the literature does not establish that flavors differentially promote switching amongst ENDS users in general.  Aside from differences in study design/methods, the heterogeneity of the existing literature is likely due, at least in part, to differences in the products studied.  Therefore, given the state of the science on flavored ENDS, and the known risks to youth, FDA has reviewed these applications for any acceptably strong  product-specific evidence.

---

[xix] Limiting youth access and exposure to marketing is a critical aspect of product regulation.  It is theoretically possible that significant mitigation efforts could adequately reduce youth access and appeal such that the risk for youth initiation would be reduced.  However, to date, none of the ENDS PMTAs that FDA has evaluated have proposed advertising and promotion restrictions that would decrease appeal to youth to a degree significant enough to address and counter-balance the substantial concerns, and supporting evidence, discussed above regarding youth use.  Similarly, we are not aware of access restrictions that, to date, have been successful in sufficiently reducing the ability of youth to obtain and use ENDS.  Accordingly, for the sake of efficiency, the evaluation of the marketing plans in applications will not occur at this stage of review, and we have not evaluated any marketing plans submitted with these applications.

[xx] This discrepancy between the literature for youth initiation and adult switching also likely reflects fundamental differences in the two outcomes being assessed—youth initiation and switching among adult smokers—and their determinants.  For switching among adult smokers, the behavior change is occurring in the context of nicotine dependence.  Thus, the specific product's ability to provide adequate reinforcement and continue to satisfy a smoker's cravings over time, which is a function of the design of the specific product itself, are critical factors in determining likelihood of continued use and the product's ability to promote switching.  Whereas for youth initiation, experimentation among naïve or novice users is not driven by these factors.

AA32

More specifically, in order to adequately assess whether such an added benefit has been demonstrated, FDA has reviewed these applications for product-specific[xxi] evidence that would enable a comparison between the applications' new flavored products and an appropriate comparator tobacco-flavored product (both ENDS) in terms of their impact on tobacco use behavior among adult smokers. Consistent with section 910(c)(5), evidence generated using either an RCT design or longitudinal cohort study design is mostly likely to demonstrate such a benefit, although other types of evidence could be adequate if sufficiently reliable and robust, and will be evaluated on a case-by-case basis. [xxii]

CTP will consider other types of evidence if it is sufficiently robust and direct to demonstrate the impact of the new ENDS on adult switching or cigarette reduction. Uptake and transition to ENDS use is a behavioral pattern that requires assessment at more than one time point. In addition, the transition from smoking to exclusive ENDS use typically involves a period of dual use. Therefore, evaluating the behavioral outcomes needed to show any benefit of the product requires observing the actual behavior of users over time. With both RCT and cohort study designs, enrolled participants are followed over a period of time, with periodic and repeated measurement of relevant outcomes.

In contrast, cross-sectional surveys entail a one-time assessment of self-reported outcomes: although participants can be asked to recall their past behavior, the single data collection does not enable reliable evaluation of behavior change over time. Consumer perception studies (surveys or experiments) typically assess outcomes believed to be precursors to behavior, such as preferences or intentions related to the new products, but are not designed to directly assess actual product use behavior. Moreover, the general scientific literature, though informative for evaluation of some types of products, is not adequate to address this assessment because it does not provide product-specific information. This is because the effectiveness of a product in promoting switching among smokers arises from a combination of its product features—including labeled characteristics like flavor and nicotine concentration—as well as the sensory and subjective experience of use (taste, throat hit, nicotine delivery), and can also be influenced by how the device itself looks and feels to the use.

While RCTs and cohort studies both enable direct assessment of behavioral outcomes associated with actual product use over time, there are pros and cons to each type of design. While RCTs afford greater control and internal validity; cohort studies enable stronger generalizability because

---

[xxi] By product-specific, we mean the data are based on studies using the specific new products that are the subject of the application(s). If the applicant has a large number of product variants (e.g., nicotine concentration and/or flavor options), it may be justifiable to bridge data from a study including a subset of their products to one or more of their other products (not included in the study). In contrast, because of the need for product-specific information, bridging from a different set of products (not the subject of the application) would not be appropriate here.

[xxii] Conversely, such longitudinal or product-specific data are not necessarily required to assess experimentation and appeal among youth. The available literature on youth initiation contains valid scientific evidence sufficient to evaluate the risk to youth of ENDS. The literature includes longitudinal cohort studies, such as the PATH study, which have been used to assess uptake of tobacco products, including flavored ENDS, among youth and young adults. These studies have evaluated the impact of flavors on the promotion of established regular use. Additionally, the literature includes large, nationally representative cross-sectional surveys, which are among the best available evidence to understand patterns of youth ENDS use and the key characteristics associated with such use. These studies enable observation of youth behavior as it naturally occurs in representative samples of the U.S. population. These data available in the literature provide clear and overwhelming evidence that ENDS are the most widely used products by youth, the majority of youth users use a flavored ENDS, and that youth users are more likely to use flavored ENDS than adult ENDS users. We note that, in assessing the risks to youth from flavored ENDS, RCTs are not possible because it would be unethical to randomize youth never or naive users to try a particular ENDS to examine what impact it would have on initiation, experimentation, or progression to regular use.

conditions are closer to real-world.  We are aware of these as trade-offs and generally do not favor one type over the other for addressing this question.

To be informative, a study using one of these two designs would measure the impact of use of the new or appropriate comparator product tobacco-flavored ENDS and flavored products on adult smokers' tobacco use behavior over time[xxiii]; include outcomes related to ENDS use and smoking behavior to assess switching and/or cigarette reduction; and enable comparisons of these outcomes based on flavor type.  In some cases, evidence on each individual flavor option may not be feasible; bridging data from one of the applicant's flavors to other flavors of the applicant's in the same flavor category (e.g., "fruit") may be appropriate.  Furthermore, consistent with previous FDA guidance, we would expect the applicant to provide justification to support this bridging.[xxiv]  Likewise, if a flavor is tested with one nicotine concentration, it may be feasible for the applicant to bridge the study results to other nicotine concentrations, under certain circumstances, and with the appropriate justification for bridging.

Data from one of these studies could support a benefit to adult users if the findings showed that, compared to the new tobacco-flavored product, use of (each) new flavored product is associated with greater likelihood of either of these behavioral outcomes for adult smokers: (1) complete switching from cigarettes to exclusive new product use or (2) significant reduction in cigarettes per day (CPD).

### 2.3.2.3.    Conclusion

Given the known and substantial risk to youth posed by flavored ENDS, FDA has reviewed these applications for the presence of particularly reliable product-specific[xxv] evidence to demonstrate a potential for benefit to adult smokers that could justify that risk.  Based on our current understanding, a demonstration with sufficiently reliable and robust evidence that the flavored ENDS have an added benefit relative to tobacco-flavored ENDS in facilitating smokers completely switching or reducing their smoking could demonstrate the potential benefit to current users that would outweigh the risk to youth posed by flavored ENDS.

### 2.4. SCOPE OF REVIEW

The reviews evaluated whether the subject PMTAs contain evidence from a randomized controlled trial, longitudinal cohort study, and/or other evidence regarding the impact of the new products on switching or cigarette reduction that could potentially demonstrate the added benefit to adult users of their flavored ENDS over an appropriate comparator tobacco-flavored ENDS.  These reviews included a search of the PMTAs to determine whether the evidence is found anywhere within the PMTAs, and if present, if certain conditions were met (e.g., was the randomized controlled trial conducted using the new products that are the subject of the PMTA).  Our review also included a

---

[xxiii] This could include studies that are long-term (i.e., six months or longer).  In FDA's (2019) Guidance to Industry, "Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems", FDA previously stated that it did not expect that applicants would need to conduct long-term studies to support an application for ENDS.  Because the behavior change of interest (switching or cigarette reduction) occurs over a period of time, it is possible that to observe these outcomes, investigators designing these studies may decide to follow participants over a period of six months or longer.  However, it is also possible that studies with a shorter duration would be adequately reliable.
[xxiv] Bridging is discussed in FDA's 2019 Guidance to Industry cited above (fn xxiii).
[xxv] By product-specific, we mean the data are based on studies using the specific new products that are the subject of the application(s). If the applicant has a large number of product variants (e.g., nicotine concentration and/or flavor options), it may be justifiable to bridge data from a study including a subset of their products to one or more of their other products (not included in the study).  In contrast, because of the need for product-specific information, bridging from a different set of products (not the subject of the application) would not be appropriate here.

search for other studies that provided product-specific evidence related to the potential benefit to adult users.

## 3. SCIENTIFIC REVIEW

Reviews were completed by Allison Hoffman and Willa Dong on September 17, 2021.

The reviews determined that, although the PMTAs includes a RCT and longitudinal cohort study, the studies did not include the actual use of the new products or compare tobacco-flavored products to other flavored products. In particular, the data from the RCT did not sufficiently demonstrate the relative effect of the flavored products as compared to a tobacco-flavored product or include outcomes assessing switching or cigarette reduction and the data from the cohort study not sufficiently demonstrate the relative effect of the flavored products as compared to a tobacco-flavored product. Therefore, these are insufficient to evaluate the magnitude of the potential benefit to adult users that is needed to complete our assessment.

The PMTAs referenced studies including those that that assessed exposure biomarkers and physiological response following (b)(4) use, the effects of (b)(4) on health outcomes such as lung function, and surveys on consumer perceptions and intentions to use (b)(4) , but this evidence is not sufficiently strong to support the benefit to adult smokers of using these flavored ENDS because it was not clear that the referenced studies included the specific products in the application(s); evaluate product switching or cigarette reduction resulting from use of these products over time; or evaluate these outcomes based on flavor type to enable comparisons between tobacco and other flavors. Accordingly, this evidence is not adequate and therefore, we did not assess other aspects of the application as part of this scientific review.

## 4. ENVIRONMENTAL DECISION

Under 21 CFR 25.35(b), issuance of an order under section 910(c) of the Federal Food, Drug, and Cosmetic Act that a new product may not be introduced or delivered for introduction into interstate commerce (i.e., a marketing denial order) falls within a class of actions that are ordinarily categorically excluded from the preparation of an environmental assessment (EA) or environmental impact statement (EIS). To the best of our knowledge, no extraordinary circumstances exist that would preclude application of this categorical exclusion. FDA concludes that categorical exclusion is warranted and no EA or EIS is required.

## 5. CONCLUSION AND RECOMMENDATION

FDA has reviewed these applications for evidence demonstrating that the new flavored products will provide an added benefit to adult smokers relative to tobacco-flavored products. Based on our review, we determined that the PMTAs for the applicant's new products, as described in the applications and specified in Appendix A, lack sufficient evidence to demonstrate that permitting the marketing of the new products would be APPH. Thus, a Denial letter should be issued to the applicant. The applicant cannot introduce or deliver for introduction these products into interstate commerce in the United States. Doing so is a prohibited act under section 301(a) of the FD&C Act, the violation of which could result in enforcement action by FDA.

The following deficiency should be conveyed to the applicant as the key basis for our determination that marketing of the new products is not APPH:

1.  All of your PMTAs lack sufficient evidence demonstrating that your flavored ENDS will provide a benefit to adult users that would be adequate to outweigh the risks to youth. In

AA35

light of the known risks to youth of marketing flavored ENDS, robust and reliable evidence is needed regarding the magnitude of the potential benefit to adult smokers.  This evidence could have been provided using a randomized controlled trial (RCT) and/or longitudinal cohort study that demonstrated the benefit of your flavored ENDS products over an appropriate comparator tobacco-flavored ENDS. Although your PMTA includes a RCT and cohort study, it is unclear if they included the actual use of the new products.  Additionally, the RCT and cohort studies did not compare tobacco-flavored products to other flavored products or include outcomes assessing switching or cigarette reduction. In particular, the data from your RCT did not sufficiently demonstrate the relative effect of your flavored products as compared to a tobacco-flavored product or the effects on switching or cigarette reduction and the cohort study did not sufficiently demonstrate the relative effect of your flavored products as compared to a tobacco-flavored product. Therefore, these are insufficient to evaluate the magnitude of the potential benefit to adult users that is needed to complete our assessment.

Alternatively, FDA would consider other evidence but only if it reliably and robustly evaluated the impact of the new flavored vs. tobacco-flavored products on adult smokers' switching or cigarette reduction over time.  Although your PMTAs referenced studies including those that that assessed exposure biomarkers and physiological response following (b)(4) use, the effects of (b)(4) on health outcomes such as lung function, and surveys on consumer perceptions and intentions to use (b)(4) , this evidence is not sufficient to show a benefit to adult smokers of using these flavored ENDS because it was not clear that the referenced studies included the specific products in the application(s); evaluate product switching or cigarette reduction resulting from use of these products over time; or evaluate these outcomes based on flavor type to enable comparisons between tobacco and other flavors. Without this information, FDA concludes that your application is insufficient to demonstrate that these products would provide an added benefit that is adequate to outweigh the risks to youth and, therefore, cannot find that permitting the marketing of your new tobacco products would be appropriate for the protection of the public health.

## 6. APPENDIX

**Appendix A. New Products**

| Common Attributes | |
|---|---|
| Submission date | September 7, 2020 |
| Receipt date | September 7, 2020 |
| Applicant | (b) (4) |
| Product manufacturer | (b) (4) |
| Product category | ENDS (VAPES) |
| Product subcategory | ENDS Component |

AA37

## 7. REFERENCES

1.  U.S. Department of Health and Human Services. *E-cigarette Use Among Youth and Young Adults. A Report of the Surgeon General.* Atlanta, GA: U.S. Dept of Health and Human Services, Centers for Disease Control and Prevention, National Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health;2016.

2.  U.S. Food and Drug Administration. *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization (Revised). Guidance for Industry.* Silver Spring, MD: U.S. Department of Health and Human Services, Food and Drug Administration, Center for Tobacco Products;April 2020.

3.  Wang TW, Neff LJ, Park-Lee E, Ren C, Cullen KA, King BA. E-cigarette Use Among Middle and High School Students - United States, 2020. *MMWR Morb Mortal Wkly Rep.* 2020;69(37):1310-1312.

4.  Wang TW, Gentzke AS, Neff LJ, et al. Disposable E-Cigarette Use among U.S. Youth — An Emerging Public Health Challenge. *New England Journal of Medicine.* 2021;384(16):1573-1576.

5.  U.S. Department of Health and Human Services. *Preventing Tobacco Use Among Youth and Young Adults: A Report of the Surgeon General.* Atlanta, GA: U.S. Dept of Health and Human Services, Centers for Disease Control and Prevention, National Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health;2012.

6.  U.S. Department of Health and Human Services. *The Health Consequences of Smoking: 50 Years of Progress. A Report of the Surgeon General.* Atlanta, GA: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health;2014.

7.  Apelberg BJ, Corey CG, Hoffman AC, et al. Symptoms of tobacco dependence among middle and high school tobacco users: results from the 2012 National Youth Tobacco Survey. *Am J Prev Med.* 2014;47(2 Suppl 1):S4-14.

8.  Gentzke AS, Wang TW, Jamal A, et al. Tobacco Product Use Among Middle and High School Students - United States, 2020. *MMWR Morb Mortal Wkly Rep.* 2020;69(50):1881-1888.

9.  Wang TW, Gentzke AS, Creamer MR, et al. Tobacco Product Use and Associated Factors Among Middle and High School Students - United States, 2019. *MMWR Surveill Summ.* 2019;68(12):1-22.

10. Cullen KA, Liu ST, Bernat JK, et al. Flavored Tobacco Product Use Among Middle and High School Students - United States, 2014-2018. *MMWR Morb Mortal Wkly Rep.* 2019;68(39):839-844.

11. Schneller LM, Bansal-Travers M, Goniewicz ML, McIntosh S, Ossip D, O'Connor RJ. Use of Flavored E-Cigarettes and the Type of E-Cigarette Devices Used among Adults and Youth in the US-Results from Wave 3 of the Population Assessment of Tobacco and Health Study (2015-2016). *Int J Environ Res Public Health.* 2019;16(16).

12. Villanti AC, Johnson AL, Glasser AM, et al. Association of Flavored Tobacco Use With Tobacco Initiation and Subsequent Use Among US Youth and Adults, 2013-2015. *JAMA Netw Open.* 2019;2(10):e1913804.

13. Rose SW, Johnson AL, Glasser AM, et al. Flavour types used by youth and adult tobacco users in wave 2 of the Population Assessment of Tobacco and Health (PATH) Study 2014-2015. *Tob Control.* 2020;29(4):432-446.

14. Rostron BL, Cheng YC, Gardner LD, Ambrose BK. Prevalence and Reasons for Use of Flavored Cigars and ENDS among US Youth and Adults: Estimates from Wave 4 of the PATH Study, 2016-2017. *Am J Health Behav.* 2020;44(1):76-81.

15. Ambrose BK, Day HR, Rostron B, et al. Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014. *JAMA.* 2015;314(17):1871-1873.

16. Tsai J, Walton K, Coleman BN, et al. Reasons for Electronic Cigarette Use Among Middle and High School Students - National Youth Tobacco Survey, United States, 2016. *MMWR Morb Mortal Wkly Rep.* 2018;67(6):196-200.

17. Audrain-McGovern J, Strasser AA, Wileyto EP. The impact of flavoring on the rewarding and reinforcing value of e-cigarettes with nicotine among young adult smokers. *Drug Alcohol Depend.* 2016;166:263-267.

18. St Helen G, Dempsey DA, Havel CM, Jacob P, 3rd, Benowitz NL. Impact of e-liquid flavors on nicotine intake and pharmacology of e-cigarettes. *Drug Alcohol Depend.* 2017;178:391-398.

19. Morean ME, Butler ER, Bold KW, et al. Preferring more e-cigarette flavors is associated with e-cigarette use frequency among adolescents but not adults. *PLoS One.* 2018;13(1):e0189015.

20. Leventhal AM, Goldenson NI, Cho J, Kirkpatrick MG, McConnell RS, Stone MD, Pang RD, Audrain-McGovern J, Barrington-Trimis JL. Flavored E-cigarette Use and Progression of Vaping in Adolescents. *Pediatrics.* 2019 Nov;144(5):e20190789.

21. Audrain-McGovern J, Rodriguez D, Pianin S, Alexander E. Initial e-cigarette flavoring and nicotine exposure and e-cigarette uptake among adolescents. *Drug Alcohol Depend.* 2019;202:149-155.

22. Villanti AC, Johnson AL, Halenar M, et al. Menthol and mint cigarettes and cigars: Initiation and progression in youth, young adults and adults in Waves 1 - 4 of the PATH Study, 2013 - 2017. *Nicotine Tob Res.* 2020.

23. Carpenter CM, Wayne GF, Pauly JL, Koh HK, Connolly GN. New cigarette brands with flavors that appeal to youth: tobacco marketing strategies. *Health Aff (Millwood).* 2005;24(6):1601-1610.

24. Pepper JK, Ribisl KM, Brewer NT. Adolescents' interest in trying flavoured e-cigarettes. *Tobacco Control.* 2016;25(Suppl 2):ii62.

25. Camenga DR, Morean M, Kong G, Krishnan-Sarin S, Simon P, Bold K. Appeal and Use of Customizable E-cigarette Product Features in Adolescents. *Tob Regul Sci.* 2018;4(2):51-60.

26. Harrell MB, Weaver SR, Loukas A, et al. Flavored e-cigarette use: Characterizing youth, young adult, and adult users. *Prev Med Rep.* 2017;5:33-40.

27. Cullen KA, Gentzke AS, Sawdey MD, et al. e-Cigarette Use Among Youth in the United States, 2019. *Jama.* 2019;322(21):2095-2103.

28. Foulds J, Veldheer S, Yingst J, et al. Development of a questionnaire for assessing dependence on electronic cigarettes among a large sample of ex-smoking E-cigarette users. *Nicotine Tob Res.* 2015;17(2):186-192.

29. Yingst J, Foulds J, Veldheer S, et al. Measurement of Electronic Cigarette Frequency of Use Among Smokers Participating in a Randomized Controlled Trial. *Nicotine Tob Res.* 2020;22(5):699-704.

30. Vogel EA, Prochaska JJ, Ramo DE, Andres J, Rubinstein ML. Adolescents' E-Cigarette Use: Increases in Frequency, Dependence, and Nicotine Exposure Over 12 Months. *J Adolesc Health.* 2019;64(6):770-775.

31. Slotkin TA. Nicotine and the adolescent brain: insights from an animal model. *Neurotoxicol Teratol.* 2002;24(3):369-384.

32. Yuan M, Cross SJ, Loughlin SE, Leslie FM. Nicotine and the adolescent brain. *J Physiol.* 2015;593(16):3397-3412.

33. Bava S, Tapert SF. Adolescent brain development and the risk for alcohol and other drug problems. *Neuropsychol Rev.* 2010;20(4):398-413.

34. Bernheim A, Halfon O, Boutrel B. Controversies about the enhanced vulnerability of the adolescent brain to develop addiction. *Front Pharmacol.* 2013;4:118.

35. Casey BJ, Jones RM. Neurobiology of the adolescent brain and behavior: implications for substance use disorders. *J Am Acad Child Adolesc Psychiatry.* 2010;49(12):1189-1201; quiz 1285.

36. Doremus-Fitzwater TL, Varlinskaya EI, Spear LP. Motivational systems in adolescence: possible implications for age differences in substance abuse and other risk-taking behaviors. *Brain Cogn.* 2010;72(1):114-123.

37.  Shulman EP, Smith AR, Silva K, et al. The dual systems model: Review, reappraisal, and reaffirmation. *Dev Cogn Neurosci.* 2016;17:103-117.

38.  Kota D, Sanjakdar S, Marks MJ, Khabour O, Alzoubi K, Damaj MI. Exploring behavioral and molecular mechanisms of nicotine reward in adolescent mice. *Biochem Pharmacol.* 2011;82(8):1008-1014.

39.  Shram MJ, Lê AD. Adolescent male Wistar rats are more responsive than adult rats to the conditioned rewarding effects of intravenously administered nicotine in the place conditioning procedure. *Behav Brain Res.* 2010;206(2):240-244.

40.  Natividad LA, Torres OV, Friedman TC, O'Dell LE. Adolescence is a period of development characterized by short- and long-term vulnerability to the rewarding effects of nicotine and reduced sensitivity to the anorectic effects of this drug. *Behav Brain Res.* 2013;257:275-285.

41.  de la Peña JB, Ahsan HM, Tampus R, et al. Cigarette smoke exposure during adolescence enhances sensitivity to the rewarding effects of nicotine in adulthood, even after a long period of abstinence. *Neuropharmacology.* 2015;99:9-14.

42.  Conner M, Grogan S, Simms-Ellis R, et al. Do electronic cigarettes increase cigarette smoking in UK adolescents? Evidence from a 12-month prospective study. *Tob Control.* 2017;27(4):365-372.

43.  Holliday ED, Gould TJ. Chronic Nicotine Treatment During Adolescence Attenuates the Effects of Acute Nicotine in Adult Contextual Fear Learning. *Nicotine Tob Res.* 2017;19(1):87-93.

44.  Counotte DS, Spijker S, Van de Burgwal LH, et al. Long-lasting cognitive deficits resulting from adolescent nicotine exposure in rats. *Neuropsychopharmacology.* 2009;34(2):299-306.

45.  Fountain SB, Rowan JD, Kelley BM, Willey AR, Nolley EP. Adolescent exposure to nicotine impairs adult serial pattern learning in rats. *Exp Brain Res.* 2008;187(4):651-656.

46.  Soneji S, Barrington-Trimis JL, Wills TA, et al. Association Between Initial Use of e-Cigarettes and Subsequent Cigarette Smoking Among Adolescents and Young Adults: A Systematic Review and Meta-analysis. *JAMA Pediatr.* 2017;171(8):788-797.

47.  Aleyan S, Cole A, Qian W, Leatherdale ST. Risky business: a longitudinal study examining cigarette smoking initiation among susceptible and non-susceptible e-cigarette users in Canada. *BMJ Open.* 2018;8(5):e021080.

48.  Berry KM, Fetterman JL, Benjamin EJ, et al. Association of Electronic Cigarette Use With Subsequent Initiation of Tobacco Cigarettes in US Youths. *JAMA Netw Open.* 2019;2(2):e187794.

49.  Hammond D, Reid JL, Cole AG, Leatherdale ST. Electronic cigarette use and smoking initiation among youth: a longitudinal cohort study. *Cmaj.* 2017;189(43):E1328-e1336.

50.  Loukas A, Marti CN, Cooper M, Pasch KE, Perry CL. Exclusive e-cigarette use predicts cigarette initiation among college students. *Addict Behav.* 2018;76:343-347.

51.  Treur JL, Rozema AD, Mathijssen JJP, van Oers H, Vink JM. E-cigarette and waterpipe use in two adolescent cohorts: cross-sectional and longitudinal associations with conventional cigarette smoking. *Eur J Epidemiol.* 2018;33(3):323-334.

52.  Kintz N, Liu M, Chou CP, et al. Risk factors associated with subsequent initiation of cigarettes and e-cigarettes in adolescence: A structural equation modeling approach. *Drug Alcohol Depend.* 2020;207:107676.

53.  Lozano P, Barrientos-Gutierrez I, Arillo-Santillan E, et al. A longitudinal study of electronic cigarette use and onset of conventional cigarette smoking and marijuana use among Mexican adolescents. *Drug Alcohol Depend.* 2017;180:427-430.

54.  Stanton CA, Bansal-Travers M, Johnson AL, et al. Longitudinal e-Cigarette and Cigarette Use Among US Youth in the PATH Study (2013-2015). *J Natl Cancer Inst.* 2019;111(10):1088-1096.

55.  Best C, Haseen F, Currie D, et al. Relationship between trying an electronic cigarette and subsequent cigarette experimentation in Scottish adolescents: a cohort study. *Tob Control.* 2017;27(4):373-378.

56.  Bold KW, Kong G, Camenga DR, et al. Trajectories of E-Cigarette and Conventional Cigarette Use Among Youth. *Pediatrics.* 2018;141(1).

57.    National Academies of Sciences Engineering Medicine. Public Health Consequences of E-Cigarettes. In. Washington, DC: National Academies Press; 2018.

58.    Edwards KC, Sharma E, Halenar MJ, et al. Longitudinal pathways of exclusive and polytobacco cigar use among youth, young adults and adults in the USA: findings from the PATH Study Waves 1-3 (2013-2016). *Tob Control.* 2020;29(Suppl 3):s163-s169.

59.    Gentzke AS, Creamer M, Cullen KA, et al. Vital Signs: Tobacco Product Use Among Middle and High School Students - United States, 2011-2018. *MMWR Morb Mortal Wkly Rep.* 2019;68(6):157-164.

60.    Wang TW, Gentzke A, Sharapova S, Cullen KA, Ambrose BK, Jamal A. Tobacco Product Use Among Middle and High School Students - United States, 2011-2017. *MMWR Morb Mortal Wkly Rep.* 2018;67(22):629-633.

61.    Osei AD, Mirbolouk M, Orimoloye OA, et al. Association Between E-Cigarette Use and Chronic Obstructive Pulmonary Disease by Smoking Status: Behavioral Risk Factor Surveillance System 2016 and 2017. *Am J Prev Med.* 2020;58(3):336-342.

62.    Osei AD, Mirbolouk M, Orimoloye OA, et al. The association between e-cigarette use and asthma among never combustible cigarette smokers: behavioral risk factor surveillance system (BRFSS) 2016 & 2017. *BMC Pulm Med.* 2019;19(1):180.

63.    Giovanni SP, Keller TL, Bryant AD, Weiss NS, Littman AJ. Electronic Cigarette Use and Chronic Respiratory Symptoms among U.S. Adults. *Am J Respir Crit Care Med.* 2020;201(9):1157-1160.

64.    Chang JT, Anic GM, Rostron BL, Tanwar M, Chang CM. Cigarette Smoking Reduction and Health Risks: A Systematic Review and Meta-analysis. *Nicotine Tob Res.* 2021;23(4):635-642.

65.    Vyncke T, De Wolf E, Hoeksema H, et al. Injuries associated with electronic nicotine delivery systems: A systematic review. *J Trauma Acute Care Surg.* 2020;89(4):783-791.

66.    Rossheim ME, Livingston MD, Soule EK, Zeraye HA, Thombs DL. Electronic cigarette explosion and burn injuries, US Emergency Departments 2015–2017. *Tobacco Control.* 2019;28(4):472.

**FDA** **U.S. FOOD & DRUG**
**ADMINISTRATION**

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993
www.fda.gov

May 8, 2020

**WRITTEN RESPONSE**

Bidi Vapor LLC, USA
Attention: Mr. Nirajkumar Patel, CEO
401 N Wickham Rd, Ste 130
Melbourne, FL 32935

**FDA Submission Tracking Number (STN): TC0005671**

Dear Mr. Patel:

Please refer to the February 27, 2020 Meeting Granted letter where FDA notified you of our decision to provide a written response only in lieu of a face-to-face meeting as indicated in your meeting request.

This letter provides our written response to your February 8, 2020 meeting request related to your planned submission of a PMTA[1] for your electronic nicotine device system (ENDS) product, Bidi Stick.

A copy of our official written response is attached for your information. This meeting request is now closed.  Should you decide to request another meeting on this topic, a new meeting request is required.

If you have any questions please contact Antonio Thornton, Regulatory Health Project Manager, at (240) 402-3577 or Antonio.Thornton@fda.hhs.gov.

Sincerely,

Mary E. Kushman -S    2020.05.08
13:14:16 -04'00'

Mary Kushman, Ph.D., M.P.H.
Lead Toxicologist
Division of Nonclinical Science
Office of Science
Center for Tobacco Products

Enclosure:
Appendix A - Written Response

---

[1] Premarket Tobacco Product Application (PMTA) submitted under section 910 of the Federal Food, Drug, and Cosmetic Act (FD&C Act))

FDA-BIDIVAPOR-005273

product. In any case, provide a rationale for why the constituents you choose to test provide adequate information to characterize the hazard of the new product. In the event that the measured HPHCs for the new product include both increased and decreased levels related to the comparator product(s), FDA suggests that you consider conducting additional hazard or risk evaluation of the HPHCs.

6. FDA recommends providing **product stability testing** data spanning the complete shelf life of the tobacco product to adequately support the proposed shelf life and recommended storage conditions for the finished tobacco product. If you choose to submit partial long-term testing data at the time of the PMTA submission, you may also want to provide scientific evidence and justification as to why this information is sufficient, reasonable to extrapolate to the complete long-term stability data, and adequate in determining the microbial stability of the product over the complete shelf life of the tobacco product.

   Regarding **microbial testing**, FDA recommends that stability studies include testing of all attributes that are likely to influence the microbiological stability of the product and at time-points that span the complete shelf life (i.e., beginning, middle, and end) of the finished tobacco product. Complete stability testing data (i.e., sample size, sample manufacture and test date, test intervals, test methods, data sets, and a summary of results) from samples that are representative of the manufacturing scale of production is recommended.

7. **Individual perceptions, intentions, and behaviors** (e.g., appeal, likelihood of initiation and cessation) may differ as a function of the unique characteristics of each product in a PMTA. Therefore, it is helpful to provide sufficient information for each distinct product (e.g., each flavor and nicotine combination) such that FDA may evaluate whether the marketing of each distinct new product is appropriate for the protection of the public health or provide rationale and justification for how "common" (e.g., brand-level) data can be bridged or extrapolated to each of the distinct products. You may also include additional data or information sources other than "common" data that address relevant perceptions, intentions, and behaviors for each of the different varieties of new products submitted for review to assist with bridging or extrapolating "common" data to the distinct product under review. Although not required by FDA, if you choose to conduct your own studies to expand upon the available "common" data, consider how the study design, hypothesis, sample size, and results for each product will contribute to the PMTA and help FDA make a determination whether marketing of your product(s) is appropriate for the protection of the public health.

8. FDA supports the **use of different types of studies, methods, instruments, and analyses** to determine whether marketing of a tobacco product is appropriate for the protection of the public health. FDA will make this determination with respect to the risks and benefits to the population as a whole, including users and nonusers of the tobacco product. If you use data from studies or other sources which do not include your new product, FDA recommends that you provide a detailed rationale to explain why you choose to infer data on other products to your new products; whether perception and intention to use your new products predict actual use; and why bridging data from other products is relevant to your new products. FDA also recommends that you do all of the following:
   a. Define nonuser subgroups based on similar strategies found in published articles using nationally representative surveys and studies
   b. Provide detailed description of your study design and analyses (e.g., hypotheses, study population and subgroups, sample size and statistical power calculation, definition of

FDA-BIDIVAPOR-005274

exposure and outcome measures, methods of statistical analyses, and determination of statistical significance)

   c. Identify strengths and limitations of your approach

   d. Discuss how the information you provided supports that marketing of your new products is appropriate for the protection of the public health (e.g., how non-probability nature of studies informs statistical inference)

9. **Secondary analyses of national survey data** may also be used to support a PMTA. If you take this approach, FDA recommends that you explain why data for the secondary analyses are applicable to your new product(s) in the population of interest. FDA also recommends that you provide a statistical analysis plan (if available) and sufficient details, including but not limited to, data used for the secondary analyses, date of data access, design of the study or studies, hypotheses to be tested, primary and secondary objective, sample size and statistical power calculation, study population and subgroups, inclusion and exclusion criteria, a definition or description of each variable, exposure and outcome measures, statistical analyses performed, level of statistical significance, software used for the statistical analyses, interpretation of results, assessment of bias, and identification of strengths and limitations of the analyses.

10. FDA does not endorse any specific model for **population modeling**, but supports the application of comprehensive frameworks that have the capacity to assess the impact of the marketing of the new products that inform the population health standard (e.g., likelihood of initiation among never-users and former users, cessation among current tobacco users, switching completely, dual use, likelihood of product use by youth). FDA recommends your population modeling use appropriate inputs and assumptions and provide evidence on the potential effects of your new products on the population as a whole, including users and nonusers of tobacco products; taking into account increased or decreased likelihood that those who do not use tobacco products will start using such products. FDA also recommends that you clearly articulate those methods used to develop your models and provide sufficient information to allow FDA to conduct a comprehensive scientific review of your modeling strategy, evaluate the development of the models, and how the predictions (outputs) from the models are used to address the impact of your new products on the population as a whole. Providing details for your population modeling may help FDA to confirm the information provided with the application, including but not limited to:

   a. The model development plan

   b. Data sources used in the development of input parameters

   c. Information on the development and validation of your methods for using data from the Actual Use Survey and Perceptions and Behavioral Intentions Study (e.g., your algorithm for predicting purchase rates and likelihood of smokers completely switching from cigarettes to your new products)

   d. Explanation of why the selected data sources are relevant to your new products and the U.S. population

   e. Assumptions for development of models

   f. Computer codes associated with the computer implementations of the models that allows verification of outputs

   g. Model validation (e.g., sensitivity analysis)

   h. Model parameters from literature with descriptions of how the literature search was conducted and how results of the search were consolidated into the models

   i. Generalizability of results to the U.S. population

FDA-BIDIVAPOR-005275

**Bidi Vapor LLC USA Question 6:**

We are proposing "Clinical safety" of our ENDS products thorough literature review of various articles published on US FDA website, various databases or available through free search. Is there any requirement to perform actual Clinical trial for our ENDS products?

**FDA RESPONSE**:

Currently, there are no requirements from FDA for applicants to conduct clinical studies or trials to support a PMTA. To assess the human health impact of your new tobacco products, it is important to provide sufficient information so that FDA may understand the potential short and long-term health risks associated with your product. As per Section 910(b)(1)(A) of the FD&C Act, your PMTA must contain "full reports of all information, published or known to, or which should reasonably be known" to you, "concerning investigations which have been made to show the health risks of such tobacco product and whether such tobacco product presents less risk than other tobacco products." Accordingly, if there are completed clinical studies regarding the health impact of your product, consider including this information in your PMTA as clinical trials are helpful for the systematic evaluation of your products. See Comment (1) in the General FDA Responses above for considerations on submitting clinical studies. Additionally, if there are clinical studies on a similar product that can be adequately bridged to your product, these data may also be appropriate to support a determination of whether the marketing of your new tobacco product is APPH. If you choose to bridge data from a different product, including products from published literature, to your new tobacco product, we refer you to the PMTA ENDS guidance[4] for FDA's current recommendations on bridging (Section X.E.) and literature reviews (Section X.B.) for PMTAs. In addition, see our response to Question (8.3.2) in Comment (3) below and Comment (2) in the General Response above for considerations on the use of published literature in a PMTA.

**Additional FDA Comments**

**Bidi Vapor LLC USA Comment 1:**

We have started testing of below mentioned Analytical tests of our finished product. Does any additional tests required apart from this? The draft study plans of the proposed studies are attached herewith for your review and suggestions.

Analytical Tests
   a. Assay and Related Substances of Nicotine as mentioned USP
   b. Stability Studies
   c. Container closure system - Extractable and leachable studies
   d. Analysis of HPHCs in E-Liquid
   e. Added ingredients in e-liquid components – Quantitative (includes flavors)
   f. Physico-chemical properties of e-liquid and PG/VG ratio

**FDA RESPONSE**:

**Comment 1a:** Assay and Related Substances of Nicotine as mentioned USP

In Attachment I, you provide a proposed analytical method development protocol for the identification of nicotine and related substances in the finished e-liquid product (i.e., anatabine, β-nicotyrine, cotinine, myosmine, nicotine $N'$-oxide, nornicotine and anabasine).

AA45

FDA-BIDIVAPOR-005276

**Additional Comments**

You noted that one of the objectives of your meeting request was to seek clarification on the requirement, type, and category for a comparator product, if any, for a PMTA application. However, you did not include specific questions related to this topic. Section 910(b)(1) of the FD&C Act discusses that a PMTA shall contain "whether such tobacco product presents less risk than other tobacco products." Currently, FDA does not have specific requirements for evaluating comparator products in studies in a PMTA submission. However, FDA recommends you compare the health risks of your tobacco product to both products within the same category and subcategory, as well as products in different categories as appropriate. In your PMTA, it is important to provide a rationale and justification for the comparator products selected for your clinical studies. We refer you to the PMTA ENDS Guidance[4], PMTA NPRM[16], and the 2018 and 2019 CTP Public Meetings[17,18] for more information on comparator products.

---

[17] US Food and Drug Administration. Tobacco Product Application Review - A Public Meeting.  October 22-23, 2018. https://www.fda.gov/tobacco-products/ctp-newsroom/tobacco-product-application-review-public-meeting , content current as of 5/30/2019.

[18] US Food and Drug Administration.  Deemed Tobacco Product Applications - A Public Meeting.  October 28-29, 2019. https://www.fda.gov/tobacco-products/ctp-newsroom/deemed-tobacco-product-applications-public-meeting-10282019-10292019 , content current as of 12/18/2019.

AA46

FDA-BIDIVAPOR-005277